LYNDEN TRANSPORT, INC., et al.,
Appellants,

v.

STATE of Alaska et al., Appellees.

STATE of Alaska and Alaska Transportation
Commission et al., Cross-Appellants,

v.

LYNDEN TRANSPORT, INC., et al.,
Cross-Appellees.

Howard and Alice BAYLESS et al.,
Cross-Appellants,

v.

LYNDEN TRANSPORT, INC., et al.,
Cross-Appellees.

ALASKA TRUCK TRANSPORT, INC.,
Cross-Appellant,

v.

LYNDEN TRANSPORT, INC., et al.,
Cross-Appellees.

SOURDOUGH EXPRESS, INC., et al.,
Cross-Appellants,

v.

LYNDEN TRANSPORT, INC., et al.,
Cross-Appellees.

Nos. 2100 and 2114–2117.

Supreme Court of Alaska.

Feb. 24, 1975.

Milton M. Souter, Anchorage, for appellant and cross-appellee Lynden Transport, Inc.

H. John. DeNault, III, Rice, Hoppner, Blair & Hedland, Fairbanks, for appellees H & S Warehouse, Inc. and Charles A. Powell.

John M. Stern, Jr., Anchorage, for appellee and cross-appellant Alaska Truck Transport, Inc.

Roger A. McShea, Anchorage, for appellees and cross-appellants Howard and Alice Bayless, Richard, Robert and Ellis Roberts.

George L. Benesch, Anchorage, for appellees and cross-appellants Sourdough Express and Mukluk Freight Lines.

Allen McGrath, Graham & James, Anchorage, amicus curiae for Arctic Motor Freight, Inc.

Timothy G. Middleton, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., for appellee and cross-appellant State of Alaska and Alaska Transportation Commission.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

BOOCHEVER, Justice.

This appeal involves the constitutionality of certain amendments to the Alaska Motor Freight Carrier Act, AS 42.10.030 et seq. which were enacted by the state legislature in 1972 and which became effective on September 9 of that year. The amendments added new subsections (d), (e) and (f) to AS 42.10.130 granting certain resident "grandfather" carriers intrastate operating authority coextensive with the carriers' Alaska interstate operating authority without requiring a showing of public convenience and necessity.

The section as amended is set forth in its entirety in the Appendix. However, the focus of the constitutional attack on these amendments is the residency requirment contained in AS 42.10.130(d) which reads:

(d) Notwithstanding the provisions of (a)–(c) of this section, a common carrier or contract carrier constituting a *business entity which is a corporation organized under and existing by virtue of the laws of this state, whose principal business office is in this state and 51 percent or more of whose stock is owned by residents of Alaska, or a sole proprietorship and the sole proprietor is a resident of Alaska, or a partnership and each partner is a resident of Alaska, and has continuously operated as a common carrier or contract carrier in the state since January 3, 1959, possessing Alaska interstate operating authority under a grant of grandfather rights in Alaska by the Interstate Commerce Commission,* shall, by action of the Alaska Transportation Commission under this subsection, be granted Alaska intrastate operating authority coextensive with the carrier's Alaska interstate operating authority. However, no carrier otherwise eligible under the provisions of this section is ineligible by virtue of having had transferred either its Alaska interstate or Alaska intrastate operating authority, or both, from one form of business entity to another, so long as the same persons possessing the operating authority before the transfer possess at least 51 percent of the equity in the business entity after the transfer. A carrier eligible under this subsection shall, within 30 days of September 10, 1972, file an application with the Alaska Transportation Commission requesting reconciliation of its Alaska intrastate operating authority with its Alaska interstate operating authority. A carrier's failure to file an application within the 30-day period constitutes an absolute bar to the granting of operating authority under this subsection. (emphasis added)

The plaintiffs in the action below (and the appellants herein) are corporate motor carriers that possess the requisite "grandfather" rights but do not qualify as residents under the act. Three of the plaintiffs are foreign corporations: Lynden Transport and Smyth Overseas Van Lines are incorporated in Washington; Weaver Brothers, Inc. is an Oregon corporation. The other two plaintiffs are Alaska corporations, but more than 51 percent of the ownership of each is held by nonresidents.

These plaintiffs sought a declaratory judgment to the effect that the residency requirement of AS 42.10.130(d), (e) and (f) is an unconstitutional discrimination versus nonresidents. They also sought permanent injunctive relief barring the Alaska Transportation Commission (A.T.C.) from issuing any permits pursuant to the disputed provisions and barring the 15 defendants, who were competing trucking firms seeking expanded permits under the new provisions, from operating under any such permits issued by the A.T.C.

The trial court granted the declaratory relief requested on the ground that the residency-nonresidency distinction violated the plaintiffs' rights under the equal protection clause of the fourteenth amendment. However, their request for the permanent injunction was denied on the ground that the invalid residency requirement was severable from the remainder of AS 42.10.-130(d), (e) and (f).

The plaintiffs below appeal the trial court's decision regarding the severability issue. The State of Alaska and the A.T. C., as cross-appellants, seek the reversal of that portion of the trial court's decision invalidating the questioned provision. The remaining defendants generally seek affirmance of the severability decision, and those defendants who had sought unsuccessfully to uphold the constitutionality of the enactment also appear as cross-appellants with the state.[1]

---

1. Howard and Alice Bayless, Richard, Robert and Ellis Roberts, d/b/a Bayless & Roberts; Bill and Vic Unfer, d/b/a Unfer Bros.; Orville G. Ness, d/b/a O. G. Ness Truck

Although motor carriers were essentially unregulated during the territorial period, shortly after Alaska became a state dual enactments by the federal government and the state legislature brought these carriers within a comprehensive regulatory scheme encompassing both their interstate and intrastate activities.[2] Both the federal and the state acts required a showing of public convenience and necessity in order to obtain an operating permit. Both exempted from this requirement those resident and nonresident carriers who could establish that they had regularly carried a certain type of commodity between different geographical points within Alaska or between a point in Alaska and one anywhere else in interstate commerce.

Under these grandfather provisions, carriers endeavored to establish their rights to both interstate and intrastate operating authority. Proceedings were held before a joint board of the Interstate Commerce Commission (I.C.C.) and the Alaska Public Service Commission (A.P.S.C.)—the predecessor of the Alaska Transportation Commission (A.T.C.). The findings, conclusions, and recommended orders of the joint board were to be submitted to the A.P.S.C. and the I.C.C. There is no evidence that such findings were ever filed with the A.P.S.C. Since the state commission made no findings of its own, the only findings and conclusions of record are those of the joint board in its report to the I.C.C.

The two administrative agencies then issued respective grandfather permits to the applicant, authorizing the carrier to contin-ue to transport the same commodities between the same geographical points that it had established were regularly transported by it over those routes prior to statehood. The benefits to be derived from grandfather status were dependent upon the extent of business carried on during the stated period and the maintenance of records sufficient to prove the scope of operations. All of the plaintiff and all of the defendant carriers herein received broader grandfather permits from the I.C.C. than from the A.P.S.C.

The fact that the operating permits were not coextensive created various inefficiencies and administrative difficulties for all concerned.[3] The definition of interstate goods and the segregation of different loads were an added burden on the carrier and on the A.T.C., whose task it was to supervise intrastate carriers and to exact compliance with its rules.[4]

The smaller resident grandfather carriers were, it seems, more adversely affected by the discrepancy than the larger non-resident grandfather carriers who relied more on interstate business anyway, and who tended to have the more well developed through-service ties with other interstate carriers. This situation was recognized by the I.C.C. in Al Renk & Sons, Inc.—Alaska "Grandfather" Application, 89 M.C.C. 91, 94 (1962):

> The nature of their [the smaller resident carriers'] operations makes them particularly susceptible to the through competition of the larger motor and water carriers and the Alaska Railroad, a gover-

Company; James F. Dieringer, d/b/a Dieringer Trucking Service; Herbert Kopperud, d/b/a Kopperud Transportation; Sig Wold Storage & Transfer, Inc.; Sourdough Express, Inc.; Denali Transportation Corporation; Alaska Truck Transport, Inc.

2. State regulation was provided by ch. 166, SLA 1960; Federal regulation was implemented by extending the authority of the I.C.C. by appropriate amendments to the Interstate Commerce Act, 49 U.S.C. § 306(a)(4) and (5) (1960).

3. For example, see infra p. 708.

4. The I.C.C. handled the same problem much more realistically:

Thus, although exceptants argue at length concerning applicant's failure to prove conclusively that certain shipments were interstate in character, we see no need to examine each and every shipment for the purpose [of] distinguishing between them inasmuch as the basic nature of applicant's operation is conclusively demonstrated of record. Al Renk & Sons, Inc.—Alaska "Grandfather" Application, 89 MCC 91, 100 (1962).

ment owned and operated rail carrier whose main line runs between Seward on the south and Fairbanks on the north via Moose Pass, Anchorage, and McKinley Park; and over whose dock at Seward most of Alaska's inbound freight passes. The great preponderance of Alaska's population is concentrated in the so-called rail belt, a factor tending to make particularly vulnerable the smaller irregular-route carriers, who, for practical reasons, cannot solicit and transport freight in conjunction in the water carriers and the railroad.

There are no official records, committee reports, etc. of the state legislature which would provide an insight into the legislative history of AS 42.10.130(d), (e) and (f).[5] The only commonly accepted sources of evidence of legislative intent existing here are the language of the statute itself and the declaration of policy which is the preamble to the Alaska Motor Freight Carrier Act, AS 42.10.010.[6]

It is with this background that we confront the legal issues so hotly and ably presented by the multiple litigants.

## I

## THE CONSTITUTIONAL CHALLENGE TO THE AMENDMENT

■ The five appellant corporations, who were plaintiffs below (hereinafter referred to as plaintiffs), contend that the 1972 amendment violates art. IV, § 2 of the United States Constitution which specifies: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." All of the plaintiffs are corporations, however, and it is well established that the privileges and immunities clause does not apply to corporations since they are not "citizens".[7]

■ The amendment is also challenged, however, under the provisions of the equal protection clause of the fourteenth amendment to the United States Constitution

---

5. The trial court refused to hear the testimony of State Senator Jalmar Kertulla who was the Chairman of the House Commerce Committee which originally drafted the questioned statute. We shall discuss the ruling *infra*.

6. AS 42.10.010 provides:

The business of operating as a motor carrier of freight for compensation or gain upon the public highways is a business affected with a public interest. The sparsely settled area, the tremendous distances between small and large centers of population, the difficult terrain and the hazards of weather make imperative that an adequate, dependable, and available transportation service for the movement of necessary supplies and material be maintained. It is the purpose of this chapter to provide the shippers and receivers of freight in the state with a stabilized service and rate structure; to foster sound economic conditions among the carriers which will guarantee transportation in the public interest; to promote adequate, economical and efficient service by motor carriers, and reasonable charges without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive ·practices; to preserve the common carrier of commodities by motor carrier in the public interest; to improve and coordin-

ate the relations between, and transportation by and regulation of, motor carriers and other carriers so that the highways of the state may be properly developed and preserved, and the public assured of adequate, complete, dependable and stable transportation service in all its phases.

7. Hague v. C.I.O., 307 U.S. 496, 512, 59 S. Ct. 954, 83 L.Ed. 1423, 1436 (1939); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869). Recently, the Supreme Court of the United States in Allenberg Cotton Co., Inc. v. Pittman, —— U.S. ——, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974), declared a Mississippi statute which denied foreign corporations not qualified to do business in the state access to the courts of the state unconstitutional as in violation of the commerce clause. Thus, other specific constitutional provisions do impose some limitations on the otherwise broad power of the state to exclude foreign corporations.

It should also be noted that the parties have not argued that the provisions of art. I, § 15 of the Alaska Constitution prohibiting the granting of special privileges and immunities has been violated, and we therefore do not consider that provision.

which prohibits states from denying "to any person within its jurisdiction the equal protection of the laws", and under the similar provision of the Alaska Constitution, art. I, § 1. Corporations which have been granted permission to do business within a state are considered to be "persons" afforded protection under the equal protection clause.[8] Thus, we must look to the equal protection clauses of the United States and Alaska constitutions to determine the validity of the questioned residency requirement. In making our analysis, however, cases involving the privileges and immunities clause may be of assistance to the extent that they rely on the same standards as those applied to the equal protection clause.

■ A duality of standards has been evolved in determining violations of the equal protection clause. If legislation interferes with a fundamental constitutional right or involves a suspect classification, it will be the subject of strict judicial scrutiny,[9] and the burden is on the state to establish a compelling state interest justifying the discrimination. Otherwise, the legislation will be examined to determine whether it rationally furthers a legitimate state purpose.[10]

The 1972 amendments to the Alaska Motor Freight Carrier Act distinguished between two classes of carriers possessing Alaska interstate operating authority under a grant of grandfather rights by the I.C.C.[11] The favored class, entitled to an automatic grant of intrastate operating authority coextensive with the carrier's Alaska interstate operating authority, consists of Alaska corporations whose principal office is located in the state and 51 percent or more of whose stock is owned by Alaska residents, resident Alaskan sole proprietors, and resident Alaskan partnerships. Nonresident corporations and Alaskan corporations whose principal place of business is not in Alaska or which lack the requisite percentage of Alaskan shareholders fall into the class not entitled to such expanded intrastate routes.

Thus the classification is based on residential qualifications alone. No cases have been cited to us indicating that a classification based on residence is per se suspect,[12]

8. Wheeling Steel Corp. v. Glander, 337 U.S. 562, 69 S.Ct. 1291, 93 L.Ed. 1544 (1949); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Power Mfg. Co. v. Saunders, 274 U.S. 490, 47 S.Ct. 678, 71 L.Ed. 1165 (1927).

9. See Gilbert v. State, 526 P.2d 1131 (Alaska 1974); State v. Adams, 522 P.2d 1125 (Alaska 1974); Breese v. State, 501 P.2d 159 (Alaska 1972).

10. San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); State v. Wylie, 516 P.2d 142 (Alaska 1973). It has been suggested that there is mounting discontent with the rigid two-tier formulation of the equal protection doctrine, and that the United States Supreme Court is prepared to use the clause more rigorously to invalidate legislation without expansion of "fundamental rights" or "suspect" categories and the concomitant resort to the "strict scrutiny" tests. We are in agreement with the view that the Supreme Court's recent equal protection decisions have shown a tendency towards less speculative, less deferential, more intensified means-to-end inquiry when it is applying the traditional rational basis test and we approve of this development. See Gunther, Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). See e. g., James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L. Ed.2d 435 (1972); Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L. Ed.2d 225 (1971).

11. The plaintiffs have not raised on this appeal the issue of the constitutionality of grandfather clause exceptions per se, and we do not decide that question. We note, however, that the grant of grandfather rights contained in 49 U.S.C. 309(a), though the source of much litigation regarding their appropriate scope, remains valid.

12. Although *durational* residency requirements have frequently been invalidated, the requirement of bona fide residency within a state for voting [Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 999, 31 L.Ed. 2d 274, 285 (1972)], for obtaining welfare

but under some circumstances, residential qualifications have been held to impinge upon the right to travel—a recognized, protected, fundamental interest.[13] The statute in question is challenged by corporations, either nonresident but authorized to do business in the state, or resident without the requisite percentage of resident shareholders. The classification can have no effect on the right to travel of the corporations per se. While corporations may become qualified to do business in different states, the fictional entity, as such, is not capable of travel. As to the shareholders of the nonresident corporations, their residency is immaterial as under no circumstances may such corporations qualify under the amendment for the additional intrastate operating authority. As to the shareholders of the Alaska corporations, it is true that if sufficient owners of stock travelled to Alaska and established residence, such corporations could have achieved eligibility. Since such eligibility is thus available without durational requirements as to such residency of shareholders, there is no inhibition against travel as is the case where certain privileges are withheld from those who change residence to a new state but do not meet durational requirements.[14]

■ We conclude that the legislation does not impinge upon a fundamental right and is not based on a suspect criteria so as to bring into play the compelling state interest standard. We shall apply the traditional rational basis standard utilized in testing analogous economic legislation under the equal protection clause. The classic test is well stated in Morey v. Doud.[15] In holding that an Illinois law regulating and licensing firms selling money orders, with the single exception of the American Express Company, violated the equal protection clause, the United States Supreme Court stated:

> The rules for testing a discrimination have been summarized as follows: "1. The equal-protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377, Ann Cas 1912C 160.[16]

---

benefits [Shapiro v. Thompson, 394 U.S. 618, 636, 89 S.Ct. 1322, 1332, 22 L.Ed.2d 600, 616 (1969)], for payment of lower license fees [Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, 1473 (1948)], and preference for state employment [State v. Wylie, 516 P.2d 142, 150 (Alaska 1973)] has long been upheld. *But cf.* Sosna v. Iowa, —— U.S. ——, 95 S.Ct. 553, 42 L.Ed. 2d 532 (1975) (upholding divorce durational residency requirement) and Gilbert v. State, 526 P.2d 1131 (Alaska 1974) (upholding durational residency requirement for eligibility to legislative office).

13. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); United States v. Guest, 383 U.S. 745, 758, 86 S.Ct. 1170, 16 L.Ed.2d 239, 249 (1966); State v. Adams, 522 P.2d 1125 (1974); State v. Wylie, 516 P.2d 142 (Alaska 1973).

14. *See* note 13, *supra.*

15. 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). *See* K & L Distributors, Inc. v. Murkowski, 486 P.2d 351 (Alaska 1971).

16. 354 U.S. 457 at 463–64. 77 S.Ct. 1344, at 1349, 1 L.Ed.2d at 1490.

In applying this rational basis test, we must first look at the purpose of the legislation. As indicated in the introductory section of this opinion, there are no official records or legislative committee reports pertaining to the amendments. We can look to the declaration of policy of the Alaska Motor Freight Act itself, upon the assumption that the amendment, although enacted twelve years after the passage of that act, was intended to further that expressed policy.[17] That purpose, insofar as appears applicable here, may be summarized as seeking to secure for the State of Alaska an adequate, economic, dependable, and available transportation service for the movement of necessary supplies and materials, and to foster sound economic practices among the carriers which will guarantee transportation in the public interest, without unfair or destructive competitive practices. The legislative enactment, insofar as it expanded the intrastate routes of Alaskan carriers who had obtained more extensive interstate grandfather rights, could well have a rational basis to serve as a means for achieving such goals. Carriers with more extensive interstate than intrastate routes might operate less efficiently. For example, a carrier which has an interstate permit to transport a certain commodity between Anchorage and Palmer but which lacks an intrastate permit between the same two points might end up returning empty if it could not locate either a like shipment of interstate goods or some other freight it was authorized to carry. Such coextensive routes might well result not only in lower operating expenses and thus perhaps lower rates, but also in greater efficiency with better service furnished to the public.

But we fail to see how the restriction of the expanded authority to certain resident corporations, individuals or partnerships furthers this goal. If such a goal is accomplished by making certain carriers' routes coextensive with their interstate authority, why should other carriers authorized to do business in Alaska be foreclosed from the benefits of this amendment based solely on their place of incorporation or residency of shareholders?

The trial court listed, as follows, the possible justifications offered by the defendants in defense of the statute—all of which it rejected:

1. To improve the service available to the public by expanding the scope of the operating rights of resident carriers, thereby enabling such carriers to compete more extensively, efficiently and profitably.

2. To remedy alleged injustices which resulted from the grandfather hearings.

3. To strengthen Alaska's economy by increasing the number of jobs available to Alaskans and by insuring that profits made in Alaska will be reinvested in Alaska.

4. To simplify regulation of carriers by equalizing the scope of interstate and intrastate operating rights held by resident carriers.

5. To increase the amount of service available in non-metropolitan areas of Alaska.

6. To increase the number of carriers able to provide service on the North Slope without causing a further congestion of the ATC's hearing calendar.

7. To impede the further development of, and to decrease the influence of, a non-resident carrier 'oligarch' in Alaska.

While any of these reasons may have, to the extent that we can tell from the scanty evidence available, motivated the legislature to enact the subject amendments, none of them explain, let alone justify, discrimination against non-residents.

None of the conceivable justificiations with the possible exception of those numbered 2, 3 and 7 above have any relationship to the establishment of a favored class

17. AS 42.10.010 setting forth the declaration of policy is quoted in note 6, *supra*, and in the Appendix p. 718.

of residents. All of the other stated reasons would be as well or better accomplished by inclusion of all carriers with noncoextensive grandfather rights.

As to the alleged injustices which resulted from the grandfather hearings, it would appear that they could best be remedied by making all of the carriers' grandfather rights coextensive. The discrimination, therefore, bears no rational relationship to this otherwise legitimate legislative end.

The allegation that the classification would strengthen Alaska's economy by increasing the number of jobs available to Alaskans and insuring that profits made in Alaska will be reinvested in Alaska is apparently based on the assumption that the carriers qualifying under the amendment would be more likely to hire Alaskans and reinvest profits there than would the excluded class. Whether such economic favoritism is a permissible justification for a discriminatory classification will be discussed later in this opinion, but, in any event, we find no basis for the assumption that qualified resident carriers would be more likely to hire Alaskans and reinvest profits there than the excluded carriers.

The final alleged justification, impeding the further development of and decreasing the influence of a nonresident carrier oligarch, raises the same question as to whether such economic protectionism is a valid justification for a distinction between residents and nonresidents.

If such a distinction were valid, it is readily apparent that state legislatures subject to pressures from local interests would hasten to enact legislation favoring local interests and discriminating against nonresidents. Handicapping nonresidents admitted to do business in a state, however, has never in itself been considered a valid reason for a classification.

Many of the cases dealing with this question involve citizens, and are based on the privileges and immunities clause of the Federal Constitution. But the standards used in determining whether or not there has been a violation of the constitutional provision are so similar to the rational basis test applied to the equal protection clause as to make the privileges and immunities cases helpful in analyzing the problem.

In Toomer v. Witsell,[18] a license fee for nonresident shrimp fishermen one hundred times the fee for resident fishermen was held to be invalid. The court set forth the standard to be applied as follows:

Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principal that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures.[19]

We note that this test is almost identical to that which we held to apply to the equal protection clause in K & L Distributors, Inc. v. Murkowski:[20] "The rule often has been stated to be that the classification 'must rest on some ground or difference having a fair and substantial relation to the object of the legislation'."

---

18. 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

19. *Id.* at 396, 68 S.Ct. at 1162, 92 L.Ed. at 1471 (footnote omitted).

20. 486 P.2d 351, 359 (Alaska 1971) (footnote omitted), *quoting* Royster Guano Co. v.

Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990–91 (1920), wherein the language reads: "But the classification . . . must rest upon some ground of difference having a fair and substantial relation to the object of the legislation . . .."

In *Toomer,* the Court indicated that the state could charge nonresidents a differential which would merely compensate the state for any added enforcement burden the nonresident fishermen may impose, but that there was no reasonable relationship between the danger represented by noncitizens as a class and the discrimination practiced upon them.[21] Similarly, Alaska license fees discriminating against nonresidents were stricken in Mullaney v. Anderson.[22]

In Brown v. Anderson,[23] an Alaskan law authorizing the Board of Fish and Game to close areas to fishing by nonresidents when it was determined that there was less than an optimum run of salmon so that Alaskans licensed for the area would be enabled to catch sufficient fish to sustain them for the year was considered by a three-judge federal court which held:

> We cannot agree with defendants that there is any authority to avoid the effect of the privileges and immunities clause solely under the guise of avoiding economic losses to residents. The Act cannot be sustained on the basis that this is a reasonable basis for difference in application.
>
> .    .    .    .    .    .
>
> Any discrimination must be reasonable to be sustained. Here nothing appears that will in any way justify the application of the prohibition to nonresidents and not to residents.[24]

A discrimination between residents and nonresidents based solely on the object of assisting the one class over the other economically cannot be upheld under either the privileges and immunities or equal protection clauses. While the former applies to "citizens" and the latter to "persons", both are aimed at preventing invidious discrimination.

This similarity is strikingly borne out in the case of Edwards v. Leaver,[25] wherein a Rhode Island provision restricting licenses for commercial fishing for menhaden to legal residents of the state or corporations, 51 percent of whose stock was owned by legal residents, was held to be unconstitutional as to the individual nonresident fishermen under the privileges and immunities clause and as to foreign corporations under the fourteenth amendment's guaranty of equal protection. The three-judge federal court held:

> A careful consideration of the evidence and of the defendants' contentions fail to disclose any adequate explanation for the discrimination against non-residents inherent in this statute and for the threatened discriminatory enforcement of its provisions by these defendants. There is no substantial equality of treatment as between residents and non-residents.
>
> It has not been shown that any local evils, caused by non-residents, would be eliminated by this statute.
>
> .    .    .    .    .    .
>
> It is of course clear that the corporations here are not citizens within the meaning of the privileges and immunities clause. However, they are persons within the meaning of the equal protection and due process of law clauses. The corporate plaintiffs, therefore, are entitled under the equal protection clause to relief against the discrimination sanctioned by this statute.[26]

Similarly, in Bozanich v. Reetz,[27] a three-judge federal court struck down an Alaska fishing law as violative of the equal protection clause stating:

> Although a state may enact fishing regulations in the legitimate interests of con-

---

21. 334 U.S. at 399, 68 S.Ct. at 1163, 92 L.Ed. at 1472–73.

22. 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952).

23. 202 F.Supp. 96 (D.Alaska 1962).

24. *Id.* at 102–03.

25. 102 F.Supp. 698 (D.R.I.1952).

26. *Id.* at 702–03 (citations omitted).

27. 297 F.Supp. 300, 305 (D.Alaska 1969), vacated, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) (footnote omitted).

servation and safety, it may not, to achieve those ends, employ arbitrary and irrational means which create or protect local, monopolistic interests.

. . . . . .

We are convinced that the Alaska scheme cannot meet the equal protection requirements set forth in Morey v. Doud, [Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485] wherein the Supreme Court struck down another invidious classification in legislation concerning economic regulation.

■■■■■ Benefiting economic interests of residents over nonresidents is not a purpose which may constitutionally vindicate discriminating legislation, and, accordingly we hold that the granting of extended routes based on residency is not rationally justified.[28] We conclude that the provision of the 1972 amendment limiting the grant of expanded routes according to residency violates the equal protection clauses of the United States and Alaska constitutions.[29]

II

SEVERABILITY OF THE RESIDENCY REQUIREMENT OF AS 42.10.130(d)

The plaintiffs below, while agreeing with the decision of the superior court that the residential limitation to acquiring expanded routes is invalid, appeal from the portion of the decision holding that the residential provision is severable from the remainder of the amendment which would thus remain in full force and effect.

Title I, General Provisions of Alaska Statutes, contains the following general savings clause:

Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language, "If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of this Act and the application to other persons or circumstances shall not be effected thereby."[30] This is designed to preserve to as great an extent as possible all valid portions of enactments by the Alaska State Legislature.

The federal rule with regard to specific severability sections which are enacted as part of a challenged statute is relatively well settled. In Carter v. Carter Coal Co.,[31] the Supreme Court stated the effect of such a provision:

In the absence of such a provision, the presumption is that the Legislature intends an act to be effective as an entirety—that is to say, the rule is against the mutilation of a statute; and if any provision be unconstitutional, the presumption is that the remaining provisions fall with it. The effect of the statute [specific section] is to reverse this presumption in favor of inseparability, and create the opposite one of separability. Under the nonstatutory rule, the burden is upon the supporter of the legislation to show the separability of the provisions involved. Under the statutory rule, the burden is shifted to the assailant to show

28. Appellees rely in part on Kirk v. Board of Regents of University of California, 273 Cal.App.2d 430, 78 Cal.Rptr. 260 (1969), in which a one-year residency requirement for lower tuition was upheld. The classification was held to be reasonably related to a legitimate objective of the state, primarily on the basis that resident students (or their parents) pay taxes to the state which, in turn, support and maintain the university. No such justification is presented in our case since the nonresident carriers here involved have been subjected to Alaska taxes. See AS 43.20.010

et seq. (net income tax) and AS 42.10.240 (weight fee schedule of Alaska Motor Freight Carrier Act). See also Sosna v. Iowa, —— U.S. ——, 95 S.Ct. 553, 42 L.Ed.2d 553 (1975).

29. In view of our holding, we do not pass on the contention made by appellants that it constitutes local or special legislation in violation of art. II, § 19 of the Alaska Constitution.

30. AS 01.10.030.

31. 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936).

their inseparability. But under either rule, the determination, in the end, is reached by applying the same test—namely, What was the intent of the lawmakers?

Under the statutory rule, the presumption must be overcome by considerations which establish *"the clear probability that the invalid part being eliminated the Legislature would not have been satisfied with what remains."* [32]

By interpreting the statutory severability provisions as reversing the common law presumption that a statute void in part was void in its entirety, the Supreme Court intended to provide "a rule of construction which may sometimes aid in determining that [legislative] intent. But it is an aid merely; not an inexorable command."[33]

There seems to be little or no authority as to the difference between general and specific severability clauses.[34] The plaintiffs assert that general savings provisions, e. g. AS 01.10.030, do not give rise to any presumption whatsoever. The defendants argue that the same weak presumption arises from the general directive as would arise from the specific. Both sides cite the same passage from Sutherland's treatise on Statutes and Statutory Construction[35] to support their contrary theories.

The principle of separability is sometimes separately enacted as general law applicable to all acts subsequently adopted in the state irrespective of whether such subsequent acts contain their own separability clauses. Courts have considered these clauses as codifications of general rules of interpretation, not binding as fixed rules of law.

Although there are no measurable differences in effect between general separability acts and particular separability clauses in individual statutes, it is a reasonable inference that because a general act cannot control subsequent legislative intent and therefore is questionable evidence of it, *less weight may attach to such a general rule of separability than to the clause in a separate act.* Thus general separability statutes have been regarded as mere codifications of a canon of statutory construction. One state has given the same effect to a general severability statute as to particular saving clauses, applying the usual federal rule that it substitutes a presumption in favor of severability in place of the common-law presumption against it. But generally these statutes are treated only as aids to interpretation and not as commands.

If the valid parts are dependent or not severable from the invalid parts, all must fall. The valid parts must be enforceable as a separate law. If the remaining valid portions would not be passed by the legislature without the invalid, the statute must fail in its entirety. When the most important features or the paramount intent is invalid, the entire act must fall. Thus the rules concerning normal separability are still present (emphasis added).

█ It would seem that the soundest interpretation of this language is that, whereas a specific severability clause creates a slight presumption in favor of severability, a general clause creates an even weaker presumption. For all practical pur-

---

32. 298 U.S. at 312, 56 S.Ct. at 873, 80 L.Ed. at 1189 (emphasis added), *quoting*, Williams v. Standard Oil Co., 278 U.S. 235, 242, 49 S.Ct. 115, 73 L.Ed. 287, 309 (1929).

33. Dorchy v. Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 325, 68 L.Ed. 686, 690 (1924); *accord*, Utah Power & Light Company v. Pfost, 286 U.S. 165, 184, 52 S.Ct. 518, 76 L.Ed. 1038, 1048 (1932).

34. The cases cited by the Arctic Motor Freight Brief of Amicus Curiae [at 25] all deal with specific savings clauses. They do not constitute direct authority for the proposition that general savings clauses are to be treated the same as specific even though that conclusion is otherwise probably sound.

35. 2 Sutherland, Statutes and Statutory Construction § 44.11 (4th ed. Sands 1973) (footnotes omitted).

poses, the difference between the two is negligible.

There are only two Alaska cases applying the general severability clause, AS 01.-10.030—State v. Baker[36] and Speidel v. State.[37] In the former, the court quotes approvingly from a Washington Supreme Court decision between the same parties which invalidated and severed certain regulatory provisions of the Alaska Business License Act which it found separate from the revenue parts of the act. In *Speidel*, the court held a statute invalid only to the extent it imposed criminal liability on someone who "willfully neglects" (i. e., without conscious criminal intent) to return a rented motor vehicle to the agreed-upon destination. The court essentially invoked AS 01.10.030 to delete overbroad language from the statute. *Baker* and *Speidel*, therefore, reflect a consistent use of the general severability statute to preserve valid portions of the state legislature's enactments.

The test for determining the severability of a statute is twofold. A provision will not be deemed severable "unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall".[38]

The residency requirement contained in AS 42.10.130(d) could be struck, and the subsection could still be given complete legal effect. The section, without its constitutionally infirm provision, would read:

(d) Notwithstanding the provisions of (a)—(c) of this section, a common carrier or contract carrier constituting a business entity which . . . has continuously operated as a common carrier or contract carrier in the state since January 3,. 1959, possessing Alaska interstate operating authority under a grant of grandfather rights in Alaska by the Interstate Commerce Commission, shall, by action of the Alaska Transportation Commission under this subsection, be granted Alaska intrastate operating authority coextensive with the carrier's Alaska interstate operating authority.

The crucial question, then, is what was the legislative intent. The plaintiffs argue that the residency requirement was so narrowly drafted that the legislature would surely not have enacted subsection (d) without it; and that elimination of the residency provision would exempt a much broader class than intended from the duty of establishing that the "public convenience or necessity" would be served by the expansion of their intrastate operating authority. It is further argued that such an immediate expansion of intrastate operating authority of all eligible "grandfather" carriers both resident and nonresident would have "disruptive competitive effects."[39]

With this perception of the legislature's intent, the plaintiffs cite Sutherland's treatise on Statutes and Statutory Construction for the general rule that when an invalid provision is in the nature of an exception or exemption, it cannot be severed without improperly broadening the scope of the statute.[40] They rely primarily on Frost v.

---

36. 393 P.2d 893 (Alaska 1964).

37. 460 P.2d 77 (Alaska 1969). *See also* Egan v. Hammond, 502 P.2d 856 (Alaska 1972), where we held that an invalid section of the State Constitution requiring reapportionment to be based on "civilian population . . . as reported by the census" and thus improperly eliminating military personnel invalidated the entire provision including use of census reports. We found it highly likely that the intent in using census reports would be frustrated if the "civilian" provision was eliminated. Since the case dealt with a constitutional provision, the general severability clause, AS 01.10.030, was not discussed.

38. Dorchy v. Kansas, 264 U.S. at 290, 44 S.Ct. at 324, 68 L.Ed. at 690.

39. Brief of appellants, Lynden Transport, et al.

40. 2 Sutherland, Statutes and Statutory Construction § 44.13 (4th ed. Sands 1973):
When an exception, exemption, proviso, or any clause which limits the scope of an

Corporation Commission [41] for the definitive statement of this rule. That case involved a 1925 amendment to a 1915 Oklahoma licensing statute requiring those wishing to operate a cotton gin to make a showing of "public necessity" to the Commission. The 1925 amendment created an exception for certain agricultural cooperatives. The court ruled that, if the provision had been contained in the original enactment, it could not properly be severed

. . . [T]o hold otherwise would be to extend the scope of the law in that regard so as to embrace corporations which the Legislature passing the statute had, by its very terms, expressly excluded, and thus to go in the face of the rule that where the excepting proviso is found unconstitutional the substantive provisions which it qualifies cannot stand.[42]

■■■ While cognizant of this and other contrary authority, [43] we are of the opinion that a general ruling which states that the invalidation of an exception automatically precludes severability is overbroad. It remains a question of legislative intent and

the rule concerning invalidated exceptions is just another aid in determining that intent. For instance, in Utah Power and Light Co. v. Pfost,[44] the Supreme Court held invalid a provision exempting electricity used in irrigation from a general tax on the generation of electricity for sale.

. . . [I]t seems entirely reasonable to suppose that, if the Legislature had expressed itself specifically in respect of the matter, it would have declared that the tax, being the vital aim of the act, was to be preserved even though the specified exemptions should fall for lack of validity.[45]

The legislature's primary goal of raising revenue was perfectly valid, and it was not disturbed because of a minor unconstitutional flaw in the form of an exception.

The appellees and amicus, Arctic Motor Freight, argue generally that the dominant purpose of AS 42.10.130(d), (e) and (f) was valid even if the residency requirement should be held to be invalid. That is, the primary goal of the statute was to reconcile the disparities between the carriers' interstate and intrastate "grandfather" op-

---

act's applicability is found to be invalid, the entire act may be void on the theory that by striking out the invalid exception the scope of the act has been widened and therefore cannot properly represent the legislative intent. To extend the scope of an act's operation by invalidating a provision of limitation while allowing the remainder to continue in effect invites criticism on the ground that it amounts to judicial legislation. There is less reluctance to reach that kind of a result, however, when the repugnant limiting provision was added by way of amendment during the course of enactment because the fact that the bill was originally introduced without it furnishes some support for the view that the offending limitation is not essential to the successful operation of the legislation. This is a questionable position, however, since the fact that a limitation was added by amendment shows that legislative attention was focused very specifically on the question whether the limitation should be imposed and raises some degree of inference that a majority of the legislature was unwilling to pass the act without the limitation. (footnotes omitted)

41. 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1928).

42. Frost v. Corporation Commission, 278 U.S. at 525, 49 S.Ct. at 239, 73 L.Ed. at 490.

43. Davis v. Wallace, 257 U.S. 478, 42 S.Ct. 164, 66 L.Ed. 325 (1922).

44. 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038 (1932). *See also* Demmert v. Smith, 82 F.2d 950, 952 (9th Cir. 1936), which quoted approvingly from People v. Monterey Fish Products Co., 195 Cal. 548, 234 P. 398, 401 (1925):

The general rule is that *when a proviso in the nature of an exception to a general statute is invalid, the general provisions of the statute are not invalidated thereby,* unless it clearly appears that the provisions of the exception are so intimately and inherently related to and connected with the general provisions to which it relates that the Legislature would not have enacted the latter without the former. (emphasis added).

45. 286 U.S. at 185, 52 S.Ct. at 553, 76 L. Ed. at 1048–49.

erating authorities. If the legislature had realized its residency restriction was invalid, it would have passed the statute without it since it would not have greatly broadened the scope of the amendment.

In the alternative, the appellees argue that there were two independent aims which the state legislature sought to accomplish by passage of AS 42.10.130(d), (e) and (f). The discrimination versus nonresidents was an invalid attempt to achieve only one of those aims, i. e. to favor local business interests over those of nonresidents. However, this portion can be effectively deleted leaving the statute fully capable of accomplishing the other desired end, i. e., to correct the imbalances resulting from the original proceedings. We find this argument persuasive.

Moreover, there is yet another line of cases lending authority for the position that the residency requirement is severable. The California Supreme Court has drawn a distinction between whether a statute challenged on equal protection grounds imposes a burden or confers a benefit. If the excepting language unconstitutionally imposes a burden on a class, a member of that group may have the entire act nullified.

> But, when a privilege is granted to a citizen and withheld from a noncitizen, the latter finds relief in the provision of the federal Constitution which, by operation of law, so to speak, extends the privilege to him.[46]

In Hayes v. Superior Court of San Bernardino County,[47] the California Supreme Court stated:

> In light of the purposes and history of a particular statute or an overall statutory scheme a reviewing court may correct a

discriminatory classification by invalidating the invidious exemption and thus extending statutory benefits to those whom the Legislature unconstitutionally excluded.

The California authorities are directly applicable to the instant case where the statutory discrimination purports only to confer a special privilege and does not impose any major burdens on the excluded class of nonresidents. The cases are persuasive although we do not believe that a distinction between a special privilege and a burden should necessarily control in all cases as to the issue of severability. In the final analysis, a court must endeavor to fathom the legislative intent from all sources available to it. We conclude that the primary intent of the legislature was to extend the intrastate authority of carriers who had obtained both interstate and intrastate "grandfather" rights so as to make the routes coextensive. We hold, therefore, that the invalid portion of the amendment discriminating against nonresidents accordingly is severable.

### III

### ADEQUACY OF THE RECORD

Cross-appellants Bayless and Roberts contend that the trial court failed to consider certain valid reasons why the legislature might have enacted the questioned amendments. However, a perusal of their discussion of this point indicates that what they really mean is that the trial court erred, not in its failure to consider certain reasons, but in its rejection of those reasons as invalid. It is clear that the conceivable justifications proffered by Bayless and Roberts in their brief were, in fact, considered by the trial court. So these

---

46. Quong Ham Wah Co. v. Industrial Accident Comm., 184 Cal. 26, 192 P. 1021, 1027 (Cal.1920), appeal dismissed, 255 U.S. 445, 41 S.Ct. 373, 65 L.Ed. 723 (1921), where the court invalidated and severed a provision in a workman's compensation act which, when the contract for employment was made within the state, authorized compensation to resi-

dents but not to nonresidents who were injured outside the state.

47. 6 Cal.3d 216, 98 Cal.Rptr. 449, 453, 490 P.2d 1137, 1141 (Cal.1971), appeal dismissed, 406 U.S. 940, 95 S.Ct. 2048, 32 L.Ed.2d 328 (1972). Accord Sykes v. Superior Court of Orange County, 9 Cal.3d 83, 106 Cal.Rptr. 786, 507 P.2d 90, 96 (1973).

contentions, then, do not really question the adequacy of the record.

Bayless and Roberts also sought, however, to introduce evidence of an individual legislator's testimony concerning the legislature's intent in enacting the residency requirement in AS 42.10.130. They offered as evidence the testimony of Jalmar Kertulla, who was the Chairman of the House Commerce Committee which originally drafted the challenged provisions. The trial court refused to hear the testimony. The cross-appellants argue that, since there are no other judicially recognized source materials available, key legislators ought to be able to testify as to legislative intent at the time of the enactment (in lieu of committee reports, etc.).

We have recently disposed of this issue in Alaska Public Employees Association v. State [48] stating:

. . . [W]e are of the view that subsequent testimony of even the prime sponsor of a bill as to either his own understanding or the legislature's understanding of the meaning of that bill should not be considered by a court in construing legislative intent. We do not wish to transform statutory construction into a parade of legislators' affidavits containing their perceptions of the meaning of a bill.

When a law has been enacted, the legislature has spoken as a whole, and the recollections of an individual legislator as to what was intended are irrelevant to a determination of legislative intent. The court did not err in refusing to admit into evidence the proffered testimony.

The plaintiffs argue that they should have been permitted to supplement the record regarding the impact of a decision to sever the residency requirement. The severability of a challenged provision is a question of legislative intent. There are no official records of legislative history of the 1972 amendment maintained by the Alaska state legislature. It is therefore difficult to conceive how the appellants could have supplemented the record with any further relevant "legislative facts". It is also true that the record developed by the parties to determine the constitutionality of the provision (i. e. the history of grandfather proceedings) is substantially identical to that necessary to determine its severability.

The appellants concede in their brief that the record is probably sufficient, but they request that the case be remanded for the purpose of allowing the record to be supplemented should the court find it insufficient. We find no need to have the record supplemented.

## IV

## WAIVER

Cross-Appellant Alaska Truck Transport asserts that the nonresident grandfather carriers could have brought themselves within the exception by merging into a domestic corporation or by reincorporating in Alaska, and that their failure to take such steps constituted a waiver of the right to contest the validity of the statute. The resident carriers who were disqualified because more than 51 percent of their shares were owned by nonresidents could have qualified by transfers of shares to legal residents, stock repurchases, etc. It is asserted that the appellants had plenty of time (from June 12, 1972, when the bill was signed into law, until October 10, 1972, the end of the 30-day filing period) to transform themselves into residents.

The cross-appellants claim that Railway Express Agency, Inc. v. Virginia [49] is direct authority for this rule.

The appellant is not deprived of any rights. It can do all that it ever could. If it sees fit to acquire a new personality under the laws of Virginia it cannot complain that the new person has not the same right as itself. Of course there

---

48. 525 P.2d 12, 15–17 (Alaska 1974).

49. 282 U.S. 440, 51 S.Ct. 201, 75 L.Ed. 450 (1931).

can be no suggestion here that the clause in the State Constitution was adopted for a sinister end. And, unless it was, the inability of the new State corporation to do all that the appellant could have done is only the legitimate incident of a legitimate act.[50]

That case involved a law requiring that all corporations desiring to conduct an intrastate express business be incorporated domestically. It did not involve a discrimination against a foreign corporation already allowed to do such business in that state. It is not, therefore, on "all fours" with the facts of the instant case.

■ Although most constitutional rights are subject to waiver, they must be knowingly and voluntarily waived. In civil cases (no less than in criminal), the courts must indulge every reasonable presumption against their waiver.[51] Arguing against a waiver, the plaintiffs point out that, even if they had wished to, they could not possibly have completed the metamorphosis from a nonresident to a qualifying resident corporation in the time period allotted. We find of even more importance, however, the fact that the right to challenge an unconstitutional discrimination against nonresidents should not be lost merely because the party refused to change residence so as to comply with the provision. Both the privileges and immunities and equal protection clauses would lose their potency if arbitrary discrimination against nonresidents were to be upheld because of the possibility of change of residency.

## V

### AWARD OF ATTORNEYS' FEES

The trial court awarded three of the eleven defendants an attorney's fee of $3,000 of the $4,100 they had requested. The three defendants were the only ones who prevailed on all issues since they agreed with the plaintiffs that the residency provision was unconstitutional but also maintained that it was severable. Appellants argue that the attorney's fee should be reduced, pro rata, in accordance with the total number of defendants who argued in favor of severability.

■ Since the court found that the three defendants represented by one counsel were the only ones entitled to an award of attorney's fees, no question of overlapping awards is here presented. We see nothing unreasonable in the award to them of $3,000 attorney's fees.[52]

■ Appellants also contend that this is a public interest case, and for that reason, the award should be reduced in consideration that they were acting as private attorney generals in initiating this action below. We consider the situation as being similar to that considered in Mobil Oil Corp. v. Local Boundary Commission[53] wherein we stated:

Because the sums at stake in this controversy are large enough to prompt a suit without consideration of the public interest, the superior court could have concluded that the property owners were acting in their private interests and not in behalf of the public. Under the circumstances, we decline to hold that the award of attorneys' fees in this case amounted to an abuse of discretion.

Similarly, here there was no abuse of discretion in the award of attorney's fees.

Affirmed.[54]

RABINOWITZ, C. J., concurring in part, dissenting in part.

50. *Id.* at 444, 51 S.Ct. at 202.

51. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, n. 31 (1972).

52. We shall set aside an award of attorney's fees only if manifestly unreasonable. Grasle Electric Co. v. Clark, 525 P.2d 1081 (Alaska 1974); Morrison-Knudsen Co. v. State, 519 P.2d 834 (Alaska 1974).

53. 518 P.2d 92, 104 (Alaska 1974).

54. Appellants and those others who, like Arctic Motor Freight, failed to file within the original time period allotted by AS 42.-10.130(d) because they were clearly excluded by the unconstitutional residency requirement shall have 30 days from the date of the

## APPENDIX

### Sec. 42.10.130

(a) No common carrier, contract carrier, or temporary carrier may operate for the transportation of property in intrastate commerce for compensation in the state without a permit. An application for a permit as a common carrier or contract carrier or an extension of the permit shall be on file for at least 30 days before it is granted unless the commission finds that special conditions require the earlier granting of it. Except as provided in this section, the commission shall not grant a permit or an extension of a permit if it finds that the applicant is not financially able, properly and adequately equipped and capable of conducting the transportation service applied for in compliance with the law and rules and regulations of the commission. The commission may deny an application if the applicant or any of its principal officers or stockholders fails or has failed to comply with the laws of the state.

(b) This chapter does not confer upon any person the exclusive right or privilege of transporting property for compensation over the public highways of the state. The commission shall deny an application when it appears, after public hearing, that the additional service would endanger the stability and dependability of the service essential to the public needs as set forth in § 10 of this chapter.

(c) Except as provided in (a), (b), (d) and (e) of this section a permit shall be issued to any qualified applicant, authorizing the whole or a part of the operations covered by the application, if the proposed service is or will be required by the present or future public convenience and necessity; otherwise the application shall be denied.

(d) Notwithstanding the provisions of (a)–(c) of this section, a common carrier or contract carrier constituting a business entity which is a corporation organized under and existing by virtue of the laws of this state, whose principal business office is in this state and 51 per cent or more of whose stock is owned by residents of Alaska, or a sole proprietorship and the sole proprietor is a resident of Alaska, or a partnership and each partner is a resident of Alaska, and has continuously operated as a common carrier or contract carrier in the state since January 3, 1959, possessing Alaska interstate operating authority under a grant of grandfather rights in Alaska by the Interstate Commerce Commission, shall, by action of the Alaska Transportation Commission under this subsection, be granted Alaska intrastate operating authority coextensive with the carrier's Alaska interstate operating authority. However, no carrier otherwise eligible under the provisions of this section is ineligible by virtue of having had transferred either its Alaska interstate or Alaska intrastate operating authority, or both, from one form of business entity to another, so long as the same persons possessing the operating authority before the transfer possess at least 51 per cent of the equity in the business entity after the transfer. A carrier eligible under this subsection shall, within 30 days of September 10, 1972, file an application with the Alaska Transportation Commission requesting reconciliation of its Alaska intrastate operating authority with its Alaska interstate operating authority. A carrier's failure to file an application within the 30-day period constitutes an absolute bar to the granting of operating authority under this subsection.

(e) The Alaska Transportation Commission, upon review of the carriers' Interstate Commerce Commission grandfather certificates, shall determine which carriers are eligible under (d) of this section and issue to them, within 60 calendar days

mandate to be entered in this appeal within which time to file an application with the ATC requesting reconciliation of its Alaska intrastate operating authority with its Alaska interstate authority under the provisions of AS 42.10.130(d), (e) and (f) which we have held to be valid.

from September 10, 1972, revised intrastate operating authority. The Alaska intrastate operating authority granted under (d) and (e) of this section shall be equivalent in all respects to the Alaska interstate grandfather authority granted by the Interstate Commerce Commission. No common carrier or contract carrier which possesses a greater scope of Alaska intrastate operating authority than Alaska interstate operating authority may have the intrastate operating authority reduced in any way by the operation of (d) and (e) of this section.

(f) Nothing in (d) and (e) of this section affects carriers which have obtained interstate operating authority by means other than under grandfather rights granted by the Interstate Commerce Commission.

RABINOWITZ, Chief Justice (concurring in part, dissenting in part).

Although I am in agreement with the court's holding that the residency requirement of AS 42.10.130(d) is invalid, I disagree with the majority's conclusion that the invalid portion of AS 42.10.130(d) is severable.

Admittedly, the issue does not lend itself to easy resolution, for in the case at bar we are required to ascertain legislative intent in the absence of any solid legislative history and with the purported assistance of several aids to the determination of legislative intent which are themselves capable of varying applications. Nevertheless, I find persuasive plaintiffs' arguments that the residency requirement of AS 42.10.130(d) was so narrowly drafted that in all likelihood the legislature would not have enacted subsection (d) without the residency requirement and that elimination of the residency provision would result in the exemption of a much broader class than intended from the duty of establishing that the "public convenience or necessity" would be served by the expansion of their operating authority.

In short, my analysis of the legislation in question leads me to the conclusion that the primary intent of the legislature in enacting AS 42.10.130(d), (e), and (f) was not to extend the intrastate authority of carriers who had obtained both interstate and intrastate "grandfather" rights so as to make the routes coextensive. In my view, the dominant purpose of the questioned legislation was to benefit local residents by expansion of their intrastate operating authority.