Karen E. **ELLINGSTAD**, Appellant,

v.

**STATE** of Alaska, **DEPARTMENT OF NATURAL RESOURCES**, and University of Alaska, **Statewide Office of Land Management**, Appellees.

Karen E. **Ellingstad**, Appellant,

v.

**University of Alaska Board of Regents**, Appellee.

No. S–7741.

Supreme Court of Alaska.

May 21, 1999.

Frederick W. Triem, Petersburg, for Appellant. Marie Sansone, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska.

Peter C. Partnow, Partnow, Sharrock & Tindall, Anchorage, for Appellee University of Alaska in File No. S–7741. Ronald L. Baird, Anchorage, for Appellee Board of Regents as Trustee for the University of Alaska in File No. S–8361.

Before: MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

FABE, Justice.

## I. INTRODUCTION

Karen Ellingstad, a purchaser under the Alaska land lottery sales program, sued the State for breach of contract because she received a quitclaim deed rather than a patent from the State's assignee, the University of Alaska. Later, after Ellingstad missed several installment payments on two of her land contracts, the University sued to quiet title. Ellingstad moved to dismiss the quiet title action, claiming the University should have brought it as a compulsory counterclaim in the contract suit. Because the Universi-

ty's conveyance of a quitclaim deed to Elling-stad did not violate the terms of Ellingstad's contract with the State, we affirm the superior court's grant of summary judgment in the contract suit in favor of the University and the State. And, because the claims in Elling-stad's contract action and the University's quiet title action are not sufficiently factually related, we affirm the superior court's denial of Ellingstad's motion to dismiss the quiet title action.

## II. FACTS AND PROCEEDINGS

In 1982 Karen Ellingstad signed a contract with the Alaska Department of Natural Resources (DNR) to purchase land in the Wrangell Narrows Subdivision in Petersburg, Alaska, through Alaska's land lottery sales program.[1] Ellingstad later received two more land contracts by assignment from other original lottery purchasers. The contracts provided that, after a twenty-year payment period, Ellingstad would receive "a deed conveying the Seller's interest" in the properties. The contracts restricted Ellingstad's ability to assign her contractual rights but not DNR's right to assign its interests.

In 1985 the University of Alaska sued DNR over DNR's transfer of University trust land to the Municipality of Anchorage. After an extensive public notice and comment period, DNR approved a plan to compensate the University by conveying to it certain state land interests. In 1988 the State and the University executed the "Uni–Muni" settlement agreement, under which the University was

> responsible for the administration of the [existing land sale] contracts and [assumed] all obligations and rights of the State under the contracts, including the receipt of and accounting for payments, the conveyance of legal title to the purchasers upon fulfillment of the contract terms, and the responsibility for any termination or foreclosure proceedings.

Thus, the University assumed all obligations and rights of the State under Ellingstad's contracts.

In January 1992 Ellingstad failed to make quarterly payments on two of her three land contracts. On March 23, 1992, the University notified Ellingstad that her nonpayment constituted a breach of contract. Ellingstad paid the full balance due on the third contract in August 1992. The University issued her a quitclaim deed for the property. Asserting that the State was obligated by contract to issue her a land patent, she refused to record or accept the quitclaim deed. The University nevertheless recorded the conveyance and deed under Ellingstad's name. In 1994 the University assessed late fees and additional charges on Ellingstad's two overdue accounts pursuant to state regulations referenced in the contracts.

In September 1994 Ellingstad filed a class action suit alleging that DNR had breached its contractual duty by: (1) failing to issue her a land patent; (2) transferring its interest to the University through the Uni–Muni agreement; (3) increasing the amount of both late payment fees and recording and escrow account charges; and (4) violating the covenant of good faith and fair dealing. In her complaint, she also alleged interference with contract, misrepresentation, wrongful delegation, and violation of the uniform application clause of the Alaska Constitution. Ellingstad requested that the University reconvey the land back to DNR, that DNR issue her a patent, and that she receive damages for improper late fees and other charges. Before the court ruled on the issue of class certification, the University and the State moved for summary judgment. The court granted the motion in April 1996.

While Ellingstad's contractual suit was pending, the University sued Ellingstad to quiet title and collect payments with respect to two of her land contracts. The University alleged that Ellingstad had missed twelve quarterly payments, totaling $7,329.48, on the first contract, and fifteen payments, totaling $1,992.45, on the second contract. The University requested that the court terminate the contracts, quiet title to the land,

---

**1.** *See* AS 38.05.057 (disposal of land by lottery); *see also* AS 38.05.065(b)-(g), (i)(2) (applicable terms of contract of sale).

eject Ellingstad from the properties, and allow the University either to recoup all payments past due or to retain amounts already paid as liquidated damages. The University moved for summary judgment in its quiet title action on April 8, 1997. Two weeks later, Ellingstad moved to dismiss the University's claims on the ground that the University failed to raise them as counterclaims in her prior contractual dispute with the State. On September 2, 1997, the superior court granted the University's motion for summary judgment, and with respect to Ellingstad's motion to dismiss,

> decline[d] to hold that [the University] was required by Alaska R. Civ. P. 13(a) to plead the then defaults in payment as counterclaims to that "class action" (so entitled) against it. While the cases seem split in this issue the better result favors [the University].

Ellingstad appeals the court's grant of summary judgment in favor of the University and the State in her contract suit, as well as its denial of her motion to dismiss and grant of summary judgment in favor of the University in the quiet title action.

## III. STANDARD OF REVIEW

 We will uphold a grant of summary judgment where the record shows no "genuine· issue of material fact" and where "the moving party was entitled to judgment on the law."[2] The moving party "has the entire burden of proving that his opponent's case has no merit."[3] We review de novo questions of contract interpretation,[4] "adopt[ing] the rule of law which is most persuasive in light of precedent, reason and policy."[5] When reviewing the superior court's denial of

Ellingstad's motion to dismiss, we must interpret Alaska Civil Rule 13(a), which also presents a question of law that we review de novo.[6]

## IV. ·DISCUSSION

### A. The State Did Not Breach Its Contract with Ellingstad.

#### 1. Ellingstad's contract does not require delivery of a patent.

Ellingstad argues that the contracts impliedly require conveyance by patent. We disagree.

 First, the plain language of the contract does not require the State to issue Ellingstad a patent deed. When the language of a contract provision is unambiguous, we determine "the parties' intention from the instrument itself."[7] Here, each of Ellingstad's three contracts with the State unambiguously states: "The Seller hereby agrees ... to execute and deliver to the Purchaser or its heirs and assigns *a deed conveying Seller's interest ....*" None of Ellingstad's contracts mentions the word "patent" or any obligation to assign a certain *type* of deed. Furthermore, according to AS 34.15.050,[8] part of the statutory scheme governing conveyances, a quitclaim deed conveys all the existing legal and equitable rights of the seller in the property described in the deed. By issuing Ellingstad a quitclaim deed, the University transferred the State's interest in the land and thus satisfied the express terms of the contract.

Nevertheless, Ellingstad further argues that Alaska statutory law mandates that she receive a patent. She analogizes the land

---

2. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985) (citation omitted). *See also* Alaska R. Civ. P. 56(c).

3. *Williams v. Municipality of Anchorage,* 633 P.2d 248, 250 (Alaska 1981) (citation omitted).

4. *See Jones v. Horace Mann Ins. Co.,* 937 P.2d 1360, 1361 (Alaska 1997); *Peterson v. Wirum,* 625 P.2d 866, 872 (Alaska 1981).

5. *Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994) (quoting *Ford v. Municipality of Anchorage,* 813 P.2d 654, 655 (Alaska 1991)).

6. *See Ford,* 813 P.2d at 655 (noting that, with respect to rule interpretation, "we exercise our independent judgment"). ·

7. *Klosterman v. Hickel Inv. Co.,* 821 P.2d 118, 124 (Alaska 1991).

8. AS 34.15.050 provides:

> *Effect of quitclaim.* A deed of quitclaim and release for the form in common use is sufficient to pass all the real estate which the grantor can convey by a deed of bargain and sale.

sale lottery program to the Alaska homesite program,[9] the latter of which specifically requires that the State issue a patent deed when certain statutory requirements are met.[10] But AS 38.05.057, the statute governing land sale lotteries, contains no such parallel provision requiring conveyance of patent deeds.[11] We thus reject Ellingstad's "statutory obligation" argument.

Ellingstad alternatively contends that, because state practice is to issue patents and not quitclaim deeds, the contract impliedly requires a patent deed. The regulation governing land exchanges, however, states that "[DNR] will convey land or interests in land by patent *or* quitclaim deed."[12] In its final finding regarding the Uni–Muni settlement, DNR recognized that, although "[n]ormally, a state patent would be issued to the contract holder," the issuance of a quitclaim deed for contracts assumed by the University was "in the best interests of the state." And Ellingstad does not provide, nor have we discovered, any legal authority compelling the State to include the same terms and conditions in all of its land disposals.

2. *Ellingstad received the functional equivalent of a patent.*

■ Ellingstad claims that, because "[a] patent is the highest evidence of title," the quitclaim deed she received from the University must necessarily be of lesser value and, thus, must constitute a breach of contract on the part of the State. As the United States Supreme Court explained long ago: "In the first place, the patent is a deed of the United States. As a deed, its operation is that of a quit-claim, or rather of a conveyance of such interest as the United States possessed in

the land...."[13] We have recognized the same principle here in Alaska.[14] Thus, a patent deed operates as a quitclaim deed in that it merely conveys whatever interest the State has in the land.

Accordingly, whether by quitclaim or patent deed, Ellingstad received the equivalent of a land patent—an undisturbed, unencumbered interest in state land. Although the State conveyed the land to the University through the Uni–Muni settlement, that agreement is not an encumbrance on the land because the University took the property subject to Ellingstad's contracts. Alaska law assures that "land owned by the University of Alaska is not and may not be treated as state public domain land" and "may not be acquired by adverse possession, prescription, or in any other manner except by conveyance from the university."[15] Had Ellingstad's land passed through many different owners, or had it been encumbered in any way, her argument would have more force.

■ Ellingstad next asserts that a patent deed would better preserve her right to any interest the State might acquire in the land *after* the State issues her the deed. The State Land Disposal Brochure warns potential lottery participants that

> [t]he state has not yet received final patent from the federal government for some land available under this offering. Such lands are designated as tentatively approved (T.A.). Title for parcels on tentatively approved land will be conditioned on the State receiving patent from the federal government.

Ellingstad argues that, if the State were to receive a patent from the federal government

---

9. *See* AS 38.08.010–.120.

10. AS 38.08.060 provides:
> *Issuance of patent.* (a) A person who enters upon homesite entry land under a permit issued by the director shall be issued a patent to the land conveying an unencumbered title....

11. Similarly, the regulations governing both land sale lotteries and installment contracts contain no patent deed requirement. *See* 11 Alaska Administrative Code (AAC) 67.060–.070; 11 AAC 67.875–.880 (1996).

12. 11 AAC 67.280 (emphasis added).

13. *Beard v. Federy,* 70 U.S. (3 Wall.) 478, 491, 18 L.Ed. 88 (1866).

14. *See North Star Terminal & Stevedore v. State,* 857 P.2d 335, 340 (Alaska 1993) (regarding State issued tideland patent); *City of Anchorage v. Nesbett,* 530 P.2d 1324, 1329 (Alaska 1975) (noting that issuance of a patent by the United States operates as a quitclaim); *see also* 63C Am.Jur.2d *Public Lands* § 49 (1997) ("As a quitclaim deed, a land patent conveys whatever interest the government has in the soil and the land.").

15. AS 14.40.291.

for Ellingstad's properties after conveying her a quitclaim deed to the property, her interest in the property would be compromised.[16] Ellingstad is correct that "[q]uitclaim deeds normally do not transfer after-acquired interests or after-acquired title."[17] But we have also held that government patents are "without any covenants of warranty whatever; and it is clear also that the doctrine of estoppel does not apply thereto so as to pass an after-acquired title."[18] Thus, Ellingstad's interest in the land would be identical regardless of whether she received a quitclaim deed or patent. Additionally, because the Department of Interior has designated the lands as tentatively approved, the State should have the same quality of title now as it will when the federal government ultimately surveys the land.

### 3. The State's conveyance to the University was not a breach of its contract with Ellingstad.

Ellingstad claims that the State cannot force her to accept a conveyance from a different grantor—here, the University. First, we discuss whether Ellingstad's contract permits the State to convey its interest in the land to a third party. Second, we examine whether the State's transfer to the University harms Ellingstad's interests in any way.

### a. Ellingstad's contract permits the State to convey its interest to a third party.

■ Ellingstad contends that AS 38.05.920, governing assignment of state land contracts, prevents the State from assigning its interest to the University without Ellingstad's consent. Section .920 provides:

[A]ll contracts of purchase or lease of land or interest in land may be, on the affirmative approval of the director, assigned or subleased in whole or in part in writing by the contract holder or lessee, and the assignee or sublessee is subject to the provisions of laws and regulations applicable to the contract or lease.

■ Ellingstad argues that, because § .920 explicitly allows the purchaser's assignee to substitute as grantee with the State's consent but is silent on the issue of assignment by the seller, it impliedly *disallows* the seller's assignee to substitute as grantor. Ellingstad encourages us to apply the maxim of statutory interpretation "expressio unius est exclusio alterius," meaning the expression of one thing implies the exclusion of others. But "[w]hile this maxim is often a useful and logical guide to the meaning of an enactment," it will not apply if contrary to the purpose of the statute.[19] Here, interpreting the provision as requiring the seller's consent would impede the State from conveying its interest to other components of state government. Such an interpretation would also be inconsistent with AS 29.65.070 and 29.65.090, which allow conveyance and exchange of certain lands to cities by DNR in fulfillment of the cities' general grant land entitlement. Thus, we decline to interpret § .920 as forbidding the State from assigning its interests and duties as grantor to a third party.[20]

### b. The State's conveyance to the University does not harm Ellingstad's interests.

■ The State's conveyance to a third party in this case does not harm Ellingstad's

---

16. Ellingstad's contracts provide that [i]f all or part of said Parcel has been tentatively approved, but not yet patented, by the United States to the Seller, then this Contract shall be conditioned upon receipt by the Seller of such patent. If for any reasons the Seller does not receive patent, this Contract shall terminate and all payments made to the Seller pursuant to this Contract shall be refunded to the Purchaser.

17. *Willis v. City of Valdez,* 546 P.2d 570, 575 n. 8 (Alaska 1976).

18. *North Star Terminal & Stevedore v. State.,* 857 P.2d 335, 340 (Alaska 1993).

19. *Sonneman v. Hickel,* 836 P.2d 936, 939 (Alaska 1992).

20. The traditional requirement in property law that the vendor, rather than a third party, must convey the land only applies to *warranty* deeds. When, as here, the contract does not require a warranty deed, "the vendee may not ... refuse to accept a quitclaim deed from a third person which conveys *all the interest the vendor had* at the time of the making of the contract." 92 C.J.S. *Vendor and Purchaser* § 236(c) (1955) (emphasis added).

interests. When a third party grantee takes land with notice of a purchaser's interest in the land, such a grantee "takes subject to the equitable interest of the earlier purchaser ... and is under obligation to complete the contract and make a conveyance upon performance by the original purchaser."[21] In the Uni–Muni settlement, the University took the land subject to existing installment contracts and conveyed the State's interest to Ellingstad in accordance with her contract. Furthermore, "there is no anticipatory breach on the part of a vendor who conveys all, or a substantial part, of the property ... where the purchaser's rights are protected ... or where the one to whom [the conveyance] is made is not a bona fide purchaser."[22]

Also, because Alaska law treats the University as a state entity for purposes of sovereign immunity, the State's transfer to the University does not have the potential to harm Ellingstad's interest in the same way that a transfer to a private entity might. In *University of Alaska v. National Aircraft Leasing, Ltd.,*[23] we dealt with the question of whether the University is a component of the State for purposes of sovereign immunity. In holding that the University does fall within the scope of statutes governing suits against the State, we wrote:

> Despite the degree of constitutional [and] statutory autonomy the University clearly possesses, ... it stands as the single governmental entity which was specifically created by the people to meet the state-

wide need for a public institution of higher education. In this light, the University must be regarded as uniquely an instrumentality of the state itself.... [I]t exists constitutionally to act for the benefit of the state and the public generally.[24]

Ellingstad relies on a Missouri decision, *Metropolitan Tickets, Inc. v. St. Louis,*[25] to argue that a corporation without the power to levy, collect, or receive taxes is not a government entity. *Metropolitan Tickets* involved a for-profit ticket-sales corporation that sold tickets to sporting events held at a municipally owned arena and other privately owned venues.[26] Unlike the University of Alaska, however, the ticket-sales corporation was not supported by tax money and had no special constitutional origin.[27] More importantly, we made clear in *National Aircraft Leasing* that the University enjoys the status of a state entity despite its corporate character:

> The fact that the University has had conferred upon it the status of a juristic person is not dispositive.... Whatever the framers' intentions, we have in the past recognized that corporate status alone is not determinative of the question of whether or not an entity performing public or governmental functions is an agent or instrumentality of the state.[28]

Thus, the State's conveyance to the University neither violates the terms of Ellingstad's contract with the State nor threatens to harm Ellingstad's interest in the land in any way.[29]

**21.** 77 Am.Jur.2d *Vendor and Purchaser* § 376 (1997) (footnotes omitted).

**22.** 77 Am.Jur.2d *Vendor and Purchaser* § 385 (1997) (footnote omitted); *see also id.* at § 299 (noting that taking subject to the rights and equities of the original purchaser is not a breach); 15 Richard R. Powell, *Powell on Real Property* § 84D.06[3] (1997) (same).

**23.** 536 P.2d 121 (Alaska 1975).

**24.** *Id.* at 124–25.

**25.** 849 S.W.2d 52 (Mo.App.1993).

**26.** *See id.* at 53.

**27.** *See id.* at 55. The court based its holding in part on the fact that tax money did not support

the corporation. The court also found significant that the corporation had no power to govern or regulate local and internal affairs of the community. *See id.*

**28.** 536 P.2d at 125.

**29.** Ellingstad also argues that DNR's delegation of its contractual obligations to the University runs afoul of the rules of equitable conversion. Specifically, she argues that, once she signed the land contract, the State became a mere trustee holding bare legal title in trust for her and could not convey title to a third party. But a trustee holding legal interest for the purchaser in a land purchase may still transfer that interest so long as the interest is not impaired. *See Oberholtz v. Oberholtz,* 79 Ohio App. 540, 74 N.E.2d 574, 578 (Ohio App.1947). In any case, because Ellingstad neither raised this issue in the trial court

4. *Any increase in service fees was incorporated by reference into Ellingstad's contract and did not constitute a breach by the State or the University.*

■ Ellingstad next claims that her land contracts do not authorize the State or the University to charge her late fees, fees for returned checks, fees for reestablishment of an escrow account, or recording fees. She claims the University's imposition of such administrative fees constitutes a breach of contract.

■ As a general rule, applicable laws in existence at the time of a contract's formation about which the parties are presumed to know are incorporated into the contract and become a part of it as though they had been expressly set forth in the contract.[30] Here, Ellingstad's contracts with the State contain clauses referencing and attesting to her knowledge of the provisions of Alaska law [31] that expressly contemplate assessment of service charges with respect to state installment land contracts. Hence, we read Ellingstad's contracts to include those provisions of Alaska law allowing assessment of such fees.

■ Ellingstad's contracts are silent with respect to the amount of fees the State may assess and DNR's ability to increase the charges over time. Where a contract is silent on an issue, a court may supply reasonable terms to fulfill the parties' expectations.[32] Here, the parties should have reasonably expected that the State would effect a minor increase in fees over the twenty-year life span of the contracts.[33]

■ Specifically, Ellingstad alleges that the $50 late fee imposed on her by the University was unreasonable and in breach of contract. But as of July 1, 1984, AS 38.05.065(d) expressly allowed such charges:

A breach caused by the failure to make payments required by the contract may be cured within 30 days after the notice of the breach has been received by the purchaser by payment of the sum in default together with the larger of a fee of $50 or five percent of the sum in default.[34]

■ Ellingstad also claims the State increased the amount of certain fees, such as a returned check fee and assignment fee, without proper notice to her. But, as the State points out, AS 38.05.035(a)(5) [35] permits the Director of the Division of Lands of DNR to prescribe fees or service charges for any service rendered. And, because Ellingstad attested in the contract to her knowledge of 11 AAC 05.010(a)(4)(B) and (a)(4)(E), which allow a $25 check return fee and $100 assignment of contract fee, we read the contract as incorporating these fees by reference.[36] Thus, the contract itself constituted sufficient notice of potential fees.

We therefore conclude that the administrative fees prescribed by statute and regulation are incorporated by reference into Ellingstad's contracts with the State and that any .

---

nor expressly included it in her points on appeal, we consider the argument waived. *See Cool Homes v. Fairbanks North Star Borough,* 860 P.2d 1248, 1264 n. 27 (Alaska 1993) (citation omitted).

**30.** *See Skagway City Sch. Bd. v. Davis,* 543 P.2d 218, 222 (Alaska 1975), *overruled in part on other grounds by Diedrich v. City of Ketchikan,* 805 P.2d 362, 366 n. 8 (Alaska 1991).

**31.** The contract provides that "the Purchaser is aware of the provisions of Title 38, Alaska Statutes, Title 11, Alaska Administrative Code, and other applicable laws ... and fully understands the duties and obligations of the Purchaser under this Contract."

**32.** *See State v. Fairbanks North Star Borough Sch. Dist.,* 621 P.2d 1329, 1332 (Alaska 1981); *Rego v. Decker,* 482 P.2d 834, 837 (Alaska 1971).

**33.** In 1980 DNR issued Department Order 81–016, setting a late-payment charge on all DNR transactions at $10 plus annual interest on amounts over $100. DNR raised the fee to $25 in 1982. *See* 11 AAC 67.879.

**34.** Moreover, the $50 assessment represents two separate $25 late service charges owed by Ellingstad.

**35.** AS 38.05.035(a) provides that the Director of DNR shall:

(5) prescribe fees or service charges, with the consent of the commissioner, for any public service rendered.

**36.** The record is unclear as to whether Ellingstad was ever charged any of the fees—check return, assignment, recording, or escrow reinstatement—that she now claims are excessive. In fact, the University paid to record the quitclaim deed on one of the properties.

assessment of such fees against Ellingstad did not constitute a breach of contract.

### 5. *Neither the State nor the University breached the implied covenant of good faith and fair dealing.*

Ellingstad further argues as part of her contractual claim that the State breached the covenant of good faith and fair dealing by failing to disclose the proposed transfer of lands to the University and the potential effects of that transfer on her title.[37] Because we conclude above that the State's transfer of its interests to the University and the conveyance of a quitclaim deed do not negatively affect Ellingstad's interests or rights under the contract, we only briefly address these arguments.

All contracts contain an implied covenant of good faith and fair dealing.[38] The covenant requires that "neither party . . . do anything which will injure the right of the other to receive the benefits of the agreement."[39] In this case, we can see no evidence in the record of the State engaging in the "[s]ubterfuges and evasions [that] violate the obligation of good faith performance."[40] DNR provided ample notice of the proposed Uni–Muni settlement, as well as an opportunity to comment on the proposed transfer, to all affected landholders. And the final findings of the Department addressed the very contentions Ellingstad now raises on appeal—namely, the University's assumption of the contract administration and its responsibility to issue an "appropriate deed to each contract holder."[41]

In sum, we agree with the superior court's assessment that

> [Ellingstad] got exactly what she paid for (a deed) at the cost she bargained for. . . . Because the State was under no contractual duty to provide Ellingstad with a patent, its failure to warn her that the Uni–Muni settlement might prevent issuance of a patent did not violate the covenant of good faith and fair dealing.

### B. *The University Was Not Required to Bring Its Action to Quiet Title as a Compulsory Counterclaim in Ellingstad's Prior Suit.*

We next consider the University's action to quiet title. Ellingstad argues that because the University did not bring its action to quiet title and to recover payment as a compulsory counterclaim in her contract suit pursuant to Alaska Civil Rule 13(a), the

---

37. Ellingstad also claims that the University interfered with contractual rights. To establish a prima facie case of intentional interference with another's contract, a plaintiff must prove that (1) a contract existed, (2) the defendant knew of the contract and intended to induce a breach, (3) the contract was breached, (4) the defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified. *See Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 793 (Alaska 1986). Because we hold that no breach occurred, we need not reach the other elements of the potential claim.

 Even if Ellingstad had presented a prima facie claim, the State is immune from suits arising out of interference with contractual rights. *See* AS 09.50.250(3). As discussed previously, the University constitutes an arm of the state for purposes of § .250(3).

38. *See State, Dep't of Natural Resources v. Transamerica Premier Ins. Co.*, 856 P.2d 766, 774 (Alaska 1993).

39. *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979).

40. *Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1168 (Alaska 1987) (quoting Restatement (Second) of Contracts § 205 cmt. d (1979)).

41. Although Ellingstad also claims that the State's behavior constitutes misrepresentation, she neither raised this issue below nor included it in her points on appeal. In such a case, courts may consider the issue waived. *See State Farm Ins. Co. v. American Mfrs. Mut. Ins. Co.*, 843 P.2d 1210, 1214 (Alaska 1992). Additionally, we have repeatedly held that no duty of good faith and fair dealing exists independent of the contract relationship. *See Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage*, 783 P.2d 1164, 1166 n. 3 (Alaska 1989). And, to the extent that the University is a component of the State, it is immune from actions for misrepresentation. *See* AS 09.50.250(3).

 Because we conclude that the quitclaim deed Ellingstad received from the University is functionally equivalent to a patent from the State, we also reject Ellingstad's argument that the State's actions violate the Uniform Application Clause of the Alaska Constitution. *See* Alaska Const., art. VIII, § 17.

action should be barred. Rule 13(a) provides:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the *transaction or occurrence* that is the subject of the opposing party's claim.... [42]

A party's failure to assert a compulsory counterclaim bars it from bringing a later independent action on that claim.[43]

In *Miller v. LHKM*,[44] one of two previous cases in which we analyzed a claim under Rule 13(a), we looked to the Restatement of Judgments for guidance in construing the phrase "transaction or occurrence":

The Restatement lists factors useful in determining whether various claims arise from the same transaction. These include whether the facts are related in time, space, origin, or motivation; whether they form a convenient trial unit; and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.[45]

In holding that the counterclaim in *Miller* was indeed compulsory, we found it particularly relevant that the claims "would involve similar testimony concerning the intent of the parties when they entered into the [agreements], the same exhibits, and the same parties."[46]

Most jurisdictions determine whether two claims arise out of the same "transaction or occurrence" by looking for a "logical relationship" between the claim and counterclaim.[47] Although we have not previously adopted the "logical relationship" test in Alaska, we considered such a relationship in the only other case in which we analyzed a claim under Rule 13(a), *Wells v. Noey*.[48] In *Wells*, we held that an action to declare a tax deed invalid should have been brought as a counterclaim in a previous suit to remove cloud on title based on a claim under the same tax deed.[49] In drawing this conclusion, we focused on several factors, including: (1) whether the same evidence would sustain both suits and whether there is "identity of things sued for"; [50] (2) whether the decision on the counterclaim was necessary to the result in the prior suit; [51] and (3) whether a logical relationship exists between the claim and counterclaim.[52]

Such a "logical relationship" does not exist between Ellingstad's contract claims and the University's action to quiet title. Both actions originate in the same land contracts, but they involve entirely different legal questions that do not call for examination of the same evidence, facts, or circumstances. Although Ellingstad includes as one of twenty-three allegations in her amended class action complaint the claim that the State unilaterally raised late payment fees, the two cases do not meaningfully overlap. Ellingstad's suit for breach of contract essentially requires us to determine whether a quitclaim deed from the University is functionally equivalent to a patent from the State. In contrast, the University's action against Ellingstad only involves her failure to make timely payments on two of the contracts.

The only significant element the two claims have in common is their origin in the same series of land contracts. We believe such a

---

**42.** Alaska R. Civ. P. 13(a) (emphasis added).

**43.** *See Andrews v. Wade & De Young, Inc.* (*Andrews I* ), 875 P.2d 89, 91 (Alaska 1994).

**44.** 751 P.2d 1356 (Alaska 1988).

**45.** *Id.* at 1361 (citing Restatement (Second) of Judgments § 24(2) (1981)).

**46.** *Id.*

**47.** *See* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1410, at 65 (2d ed.1990); *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974). Most other jurisdictions have adopted this test. *See, e.g., Pochiro v. Prudential Ins. Co.*,

827 F.2d 1246, 1249–50 (9th Cir.1987); *Caleshu v. United States*, 570 F.2d 711, 713 (8th Cir. 1978); *Booth v. Lewis*, 8 Haw.App. 249, 798 P.2d 447, 449 (1990); *Broadhurst v. Moenning*, 633 N.E.2d 326, 331 (Ind.App.1994).

**48.** 399 P.2d 217 (Alaska 1965). We did not reference *Wells* in our decision in *Miller*.

**49.** *See id.* at 220.

**50.** *See id.* at 218–19.

**51.** *See id.* at 219.

**52.** *See id.* at 219–20.

link, standing alone, is not sufficient to meet the "same transaction or occurrence" test. As the Seventh Circuit noted in comparing a Truth in Lending Act (TILA) claim to a subsequent debt collection counterclaim:

> The sole connection between a TILA claim and a debt counterclaim is the initial execution of the loan document.... A flexible application of the logical relationship test reveals that this connection is so insignificant that compulsory adjudication of both claims in a single lawsuit will secure few, if any, of the advantages envisioned in Rule 13(a).[53]

Ellingstad points to a New York district court case in which the court held that "[w]here one party brings an initial suit for breach of contract, ... an adverse party may not file a subsequent action based on the same contract, unless [the] action was pleaded as a counterclaim in the initial suit." [54] But in that case the prior suit was for recovery of equipment and the subsequent suit was for breach of contract.[55] When the subsequent suit is to quiet title and recoup past payments due, the argument for preclusion under Rule 13(a) becomes weaker.

■ We should also be wary of construing the compulsory counterclaim rule in a way that impairs "valuable contract rights." [56] In this case, the University's right to receive payment under the contracts it received from the State is a valuable contract right. Indeed, the University presumably accepted the State's offer to convey its interest in the properties on the assumption that the University would retain the right to receive payment from Ellingstad and the other grantees. We decline to preclude the University from seeking a remedy for Ellingstad's continued nonpayment by declaring that its action to quiet title should have been brought as a compulsory counterclaim.

As a policy matter, forcing lenders to file counterclaims for recovery of payment before they would otherwise select a remedy would disturb the delicate process of payment negotiations between lenders and debtors. For example, at the time Ellingstad filed her contractual claim against the State and the University, the University had not declared its intention to commence legal action against Ellingstad; rather, it had merely sent Ellingstad a notice requesting payment within thirty days to avoid possible litigation. If the court required a creditor such as the University to bring an action to quiet title as part of the debtor's suit for breach of contract or the like, we might preclude a more amicable resolution of a debtor's default. Courts in other jurisdictions have adopted this rationale in holding that an action for debt collection [57] does not arise until the creditor chooses a remedy.[58]

Forcing the University to bring its action as a counterclaim would also have been impracticable given the procedural posture of this particular case. Had Ellingstad succeeded in bringing her breach of contract suit as a class action, the University and the State would have had to bring separate coun-

---

53. *Valencia v. Anderson Bros. Ford,* 617 F.2d 1278, 1291 (7th Cir.1980), *rev'd on other grounds,* 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981), *quoted with approval in Hart v. Clayton–Parker & Assocs.,* 869 F.Supp. 774, 777 (D.Ariz. 1994); *see also Whigham v. Beneficial Finance Co. of Fayetteville,* 599 F.2d 1322, 1324 (4th Cir.1979) (declining to find debt counterclaim compulsory in TILA suit in part because the evidence needed to support each claim differed).

54. *Quick Container Servs., Inc. v. Interpool Ltd.,* 115 F.R.D. 59, 61 (S.D.N.Y.1987).

55. *See id.* at 60.

56. *Stille v. Colborn,* 740 S.W.2d 42, 44 (Tex.App. 1987).

57. This case is different from a debt collection action in that the University sought to rescind the contracts with Ellingstad and sued to quiet title, eject her from the properties, and recoup past payments due as liquidated damages. But the rationale discussed in the debt collection cases for encouraging amicable resolution of nonpayment applies to this case as well.

58. *See, e.g., Tallman v. Durussel,* 44 Wash.App. 181, 721 P.2d 985, 988 (1986) (holding that default alone is insufficient to mature the whole debt); *United–Bilt Homes, Inc. v. Sampson,* 315 Ark. 156, 864 S.W.2d 861, 862 (1993) (noting that cause of action on debt owed under contract did not arise until creditor exercised option); *Stille,* 740 S.W.2d at 44 (holding that creditor's counterclaim would have been premature prior to acceleration of the debtor's remaining installment payments).

terclaims against each and every class member for outstanding debt. And the University's selected remedy might differ depending on the grantee's nonpayment situation. Such duplicative litigation contravenes the policies underlying Rule 13(a). As we noted in *Miller*, the compulsory counterclaim rule "further[s] the goal of judicial economy by avoiding multiple suits and encouraging the determination of the entire controversy among the parties before the court *with a minimum of procedural steps*." [59] We would hinder these goals by forcing the University to bring an action to quiet title on each individual contract.

## V. CONCLUSION

Because the University's conveyance of a quitclaim deed to Ellingstad satisfied the terms of her contract with the State and because the State was free to transfer its interest in the land to the University, we AFFIRM the superior court's grant of summary judgment to the State and University with respect to Ellingstad's contractual claims. Also, because the University did not need to bring its action to quiet title as a compulsory counterclaim in the prior contract suit, we AFFIRM both the superior court's denial of Ellingstad's motion to dismiss and its grant of summary judgment in favor of the University.

**59.** 751 P.2d 1356, 1361 (Alaska 1988) (emphasis added).