SOUTHEAST ALASKA CONSERVATION COUNCIL and Tongass Conservation Society, Appellants,

v.

STATE of Alaska and University of Alaska, Appellees.

No. S–13159.

Supreme Court of Alaska.

March 13, 2009.

10. *Evans v. McTaggart,* 88 P.3d 1078, 1085 (Alaska 2004).

See also 86 P.3d 891

**1164**

Katharine S. Glover, Thomas S. Waldo, Earthjustice, Juneau, for Appellants.

J. Anne Nelson, Assistant Attorney General, Anchorage, Talis J. Colberg, Attorney General, Juneau, for Appellee State of Alaska.

James D. Linxwiler, Michael S. McLaughlin, Guess & Rudd P.C., Anchorage, for Appellee University of Alaska.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

### *OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

In 2000 and 2005 the legislature passed two bills (collectively, the act) conveying approximately 250,000 acres of land to the University of Alaska. The act directed that the net proceeds from the University's sale or use of the property be deposited in the University's endowment trust fund, an existing fund from which only earnings may be spent. Southeast Alaska Conservation Council and Tongass Conservation Society brought suit challenging the act, alleging that it violates article IX, section 7 of the Alaska Constitution by improperly dedicating state funds. The superior court granted summary judgment to the State and University, holding that the transfer of land and net proceeds from land under the act does not violate the dedicated funds clause and, in the alternative, that the University is exempt from that constitutional provision. The conservation groups appealed. We hold that (1) the sections of the act committing proceeds from the granted lands to the endowment trust fund are unconstitutional under the dedicated funds clause and (2) those sections are not severable from the remainder of the act, with the exception of provisions creating a research forest.

## II. FACTS AND PROCEEDINGS

In March 2000 the legislature passed Senate Bill 7,[1] which allowed the University of

---

1. 21st Leg., 2d Sess. (2000). The act, which consists of Senate Bill 7, passed by the 2000 legislature, as amended by House Bill 130, passed by the 2005 legislature, *see* 24th Leg., 1st Spec. Sess. (2005), is codified in significant part as AS 14.40.365, 14.40.366, and 14.40.400(a)(2). We set out here the sections of the act that are relevant to this opinion.

Section 1:
   The uncodified law of the State of Alaska is amended by adding a new section to read:
   FINDINGS AND PURPOSE. The legislature finds that

(1) as the beneficiary under the provisions of the Acts of August 30, 1890, and March 4, 1907, designating the Alaska Agricultural College and School of Mines as beneficiary, and of March 4, 1915, 38 Stat. 1214, transferring certain land for its location and support, the University of Alaska is a land grant university;

(2) under the Acts of March 4, 1915, 38 Stat. 1214, and January 21, 1929, 45 Stat. 1091, the Congress of the United States granted to the Territory of Alaska certain federal land to be held in trust for the benefit of the predecessor of the University of Alaska;

(3) the Territory was unable to receive most of the land conveyed by the Act of March 4, 1915, before repeal of that Act by Sec. 6(k) of the Alaska Statehood Act (P.L. 85–508, 72 Stat. 339);

(4) the Congress of the United States granted the State of Alaska the right to select 102,-500,000 acres of federal land under Sec. 6(b) of the Alaska Statehood Act;

(5) the land selection rights embodied in the Alaska Statehood Act reflect in part congressional recognition that the state would need the land to support its government and programs, and the Congress assumed that the State of Alaska would in turn devote some of the land or the income from it for the use and benefit of the University of Alaska;

(6) most land grant colleges in the western United States have obtained a larger land grant from the federal government than the University of Alaska has received;

(7) an academically strong and financially secure state university system is a cornerstone to the long-term development of a stable population and to a healthy, diverse economy in the state;

(8) it is in the best interests of the state and the University of Alaska that the university take ownership of a significant and substantial portfolio of income producing land in order to provide income for the support of public higher education in the state; and

(9) renewable resources should be managed on a sustained yield basis, taking into account the total land grant.

Section 2:

The uncodified law of the State of Alaska is amended by adding a new section to read: LEGISLATIVE INTENT. It is the intent of the legislature that the University of Alaska

(1) receive land under this Act in an expeditious fashion; and

(2) encourage the development of in-state value-added industries to the maximum extent feasible when developing land conveyed under AS 14.40.365.

AS 14.40.365:

(a) Except as provided in (b) of this section, before July 1, 2008, the commissioner of natural resources shall convey to the Board of Regents in trust for the University of Alaska, by quitclaim deed, the state land identified for conveyance to the university and described in the document titled "University of Alaska Land Grant List 2005," dated January 12, 2005.

(b) As soon as practicable after June 30, 2055, the commissioner of natural resources shall convey to the Board of Regents in trust for the University of Alaska, by quitclaim deed, the state land described as the "University Research Forest" and identified for conveyance to the university in the document titled "University of Alaska Land Grant List 2005," dated January 12, 2005.

. . . .

(i) The responsibility for the management of land conveyed to the Board of Regents in trust for the University of Alaska under this section vests with the Board of Regents in trust for the University of Alaska on the date of recording of that conveyance.

(j) The Board of Regents of the University of Alaska is entitled to receive any income derived from land conveyed to the Board of Regents in trust for the University of Alaska under this section accruing after the date of conveyance, including any income accruing from an existing lease, license, contract, prospecting site sale, permit, right-of-way, easement, or trespass claim.

AS 14.40.366:

(a) Before the conveyance or the disposal of an interest in the land to a third party, land conveyed to the Board of Regents in trust for the University of Alaska under AS 14.40.365 shall be managed in a manner that, to the extent practicable, permits reasonable activities of the public, including historic recent public uses, that do not interfere with the use or management of the land by the university.

(b) For land conveyed to the Board of Regents in trust for the University of Alaska under AS 14.40.365, the Board of Regents shall

(1) seek public comment on proposals for land development, exchange, or sale; and

(2) adopt policies that require the preparation of land development plans and land disposal plans.

(c) Before the Board of Regents of the University of Alaska offers a parcel of land for sale under this section, the board shall offer first refusal to the closest municipality.

(d) The Board of Regents shall adopt policies requiring public notice before approval of land development plans and land disposal plans. The policies must require that the notice be provided not less than 30 days before the proposed action and that the notice be

(1) sent to local legislators, municipalities, and legislative information offices in the vicinity of the action and at other locations as the university may designate;

(2) published in newspapers of general circulation in the vicinity of the proposed action at least once each week for two consecutive weeks; and

(3) published on state and university public notice Internet websites.

(e) In this section, "development, exchange, or sale" does not include the grant of an easement or right-of-way or the development of a campus facility.

AS 14.40.400:

(a) The Board of Regents shall establish a separate endowment trust fund in which shall be held in trust in perpetuity all

(1) [ALL] net income derived from the sale or lease of the land granted under the Act of Congress approved January 21, 1929, as amended; [AND]

(2) net income derived from the sale, lease, or management of the land [SELECTED BY AND] conveyed to the Board of Regents in trust for the University of Alaska under AS 14.40.365; however, the amount deposited in

Alaska to select 250,000 to 260,000 acres of land over which it would take title.[2] All "net income derived from the sale, lease, or management of the land selected by and conveyed to the University of Alaska" was to be placed and held in the University's endowment trust fund (ETF).[3] State law mandates that the principal of the ETF be held in perpetuity[4] and that "[t]he total return from the [ETF] shall be used exclusively for the University of Alaska."[5]

The following month, Governor Tony Knowles vetoed S.B. 7.[6] The legislature voted to override the veto by a margin normally sufficient to do so but below the three-fourths majority required to override vetoes of appropriation bills.[7] We ruled that the bill's provisions did not constitute appropriations, thus allowing the bill to become law; in so doing, we "decline[d] to address the question of whether S.B. 7 violates the constitutional prohibition on dedications because the matter was not fully litigated below."[8] On remand, the superior court refused to permit

Footnote 1—continued
<u>the endowment trust fund under this paragraph resulting from mineral lease royalties and royalty sales proceeds may not be less than 25 percent of all such mineral lease royalties and royalty sales proceeds received by the university</u>; and
 <u>(3)</u> [ALL] monetary gifts, bequests, or endowments made to the University of Alaska for the purpose of the fund.
 . . . .
 (c) The total return from the fund shall be used exclusively for the University of Alaska, as the successor under AS 14.40.030 of the Agricultural College and School of Mines.
 . . . .
 (f) In this section,
 (1) "fund" means the separate endowment trust fund established under (a) of this section;
 (2) "total return" means the total earning of the fund, including current yield, gains, and capital appreciation, less all costs, expenses, losses, and capital depreciation.
(Additions made by the act are underlined and deletions are capitalized and bracketed.)
AS 14.40.461(a):
 For the purpose of advancing research into forest practices, ecology, wildlife management, and recreation, a university research forest is established on land described as the "University Research Forest" and identified for conveyance to the Board of Regents in trust for the University of Alaska in the document titled "University of Alaska Land Grant List 2005," dated January 12, 2005.

conservation groups to intervene to litigate the dedication issue.

In 2005 the legislature passed House Bill 130.[9] That bill amended S.B. 7, rescinding the University's right to choose the land it would receive and instead conveying "by quitclaim deed" land identified by the "University of Alaska Land Grant List 2005."[10] H.B. 130 retained the requirement that net proceeds from the land be placed in the ETF.[11] The bill also established a "University Research Forest" on certain parcels of conveyed land to be used for "advancing research into forest practices, ecology, wildlife management, and recreation."[12]

Southeast Alaska Conservation Council and Tongass Conservation Society (collectively "SEACC") filed suit against the State of Alaska and the University of Alaska in the superior court in April 2007. SEACC argued that the act violates article IX, section 7 of the Alaska Constitution, which mandates that "[t]he proceeds of any state tax or license shall not be dedicated to any special purpose."[13]

**2.** S.B. 7 §§ 3, 5.

**3.** *Id.* § 6. The ETF already receives income from land the University holds under a 1929 Act of Congress. AS 14.40.400(a)(1). "[M]onetary gifts, bequests, or endowments made to the University of Alaska for the purpose of the fund" are also deposited into the ETF. AS 14.40.400(a)(3).

**4.** *See* AS 14.40.400(a).

**5.** AS 14.40.400(c).

**6.** *Alaska Legislative Council v. Knowles*, 86 P.3d 891, 893 (Alaska 2004).

**7.** *Id.*

**8.** *Id.* at 899.

**9.** 24th Leg., 1st Spec. Sess. (2005).

**10.** *Id.* §§ 1–3.

**11.** *Id.* § 5.

**12.** *Id.* § 6 (codified at AS 14.40.461). H.B. 130 contains other changes to S.B. 7 not significant to the issues before us.

**13.** Alaska Const. art. IX, § 7.

Ruling on cross-motions for summary judgment, the superior court upheld the act. The court first addressed "whether the proceeds from state land are the proceeds of a tax or licence," and ruled they are not. Despite the "substantial persuasive weight" of precedent from this court suggesting a contrary conclusion, the superior court held that the language and history of the dedicated funds clause do not support a broad reading of the text. The court next considered "whether the conveyance of revenue producing land to the University, and placement of the income from such land in an endowment trust fund for the University, can be considered a dedication of state revenues," and concluded, as an alternative reason for upholding the act, that it is not. The superior court reasoned that because the University is constitutionally chartered as a "body corporate" and explicitly permitted by the constitution to hold title to its lands,[14] it "would be illogical to assume the constitution was intended ... to divorce management of the land from the ability to receive financial benefits from the land."

The State moved to reconsider, arguing that the superior court need not have ruled on the meaning of "state tax or license" and should have based its decision solely on the alternative ground. The State contended that the court's narrowing of the scope of the dedicated funds clause was legally incorrect and, as a practical matter, would have a "profound" impact on the finances of Alaska. The superior court denied the motion, noting that its original decision "expressly does not apply to oil or gas royalties" and so would not have great significance for the state budget.

SEACC filed an emergency motion for injunction pending appeal to this court. A single justice granted that motion on June 27, 2008, enjoining the State from conveying property to the University pursuant to the act and enjoining the University from disposing of property it had already received. Both the State and the University challenged the order, and, in response, we vacated the injunction prohibiting the State from conveying property to the University but left in place the injunction against the University. We also ordered that SEACC's appeal proceed on an expedited schedule.

## III. STANDARD OF REVIEW

■ We review decisions granting summary judgment de novo and will affirm them "when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law."[15]

■ Questions of constitutional and statutory interpretation, including analysis of the constitutionality of a statute, "are questions of law to which we apply our independent judgment."[16] We will adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[17] We presume statutes to be constitutional, and the party challenging the statute bears the burden of showing otherwise.[18]

## IV. DISCUSSION

### A. Article IX, Section 7 Prohibits the Dedication of Income Derived from Land Conveyed to the University of Alaska.

This case calls on us to consider once again the scope of article IX, section 7 of the Alaska Constitution, which prohibits the earmarking of state funds for predetermined purposes. The dedicated funds clause reads:

The proceeds of any state tax or license shall not be dedicated to any special pur-

14. *See id.* art. VII, § 2 ("The University of Alaska is hereby established as the state university and constituted a body corporate. It shall have title to all real and personal property now or hereafter set aside for or conveyed to it. Its property shall be administered and disposed of according to law.").

15. *Alaska Pub. Interest Research Group v. State,* 167 P.3d 27, 34 (Alaska 2007).

16. *Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins.,* 171 P.3d 1110, 1115 (Alaska 2007).

17. *Id.* (citing *State Commercial Fisheries Entry Comm'n v. Carlson,* 65 P.3d 851, 858 (Alaska 2003)).

18. *Alaska Pub. Interest Research Group,* 167 P.3d at 34.

pose, except as provided in section 15 of this article or when required by the federal government for state participation in federal programs. This provision shall not prohibit the continuance of any dedication for special purposes existing upon the date of ratification of this section by the people of Alaska.[19]

We have discussed the origin and purpose of this clause at some length in our case law. In *State v. Alex*[20] we observed:

The origin of section 7's prohibition of earmarking can be traced back through the constitutional convention records to the Alaska Statehood Commission's studies which were prepared for the use of the delegates at the convention. One of the studies noted that "[t]he most severe obstacle to the scope and flexibility of budgeting results from the earmarking or dedication of certain revenue for specified purposes or funds." 3 Alaska Statehood Commission, Constitutional Studies pt. IX, at 27 (1955). The study stated that one of the key reasons for the popularity of dedicated taxes was that they reduced taxpayer resistance by guaranteeing that the tax would be used to benefit those who paid it. *Id.*

The study then noted that earmarking curtailed the exercise of budgetary controls and simply amounted to an abdication of legislative responsibility. *Id.* at 29–30.[21]

In *Sonneman v. Hickel*[22] we reiterated the preservation of legislative control rationale of the dedicated funds clause and quoted extensively from the constitutional debates:

The constitutional convention committee which drafted the prohibition on the dedication of funds commented that the reason for the prohibition is to preserve control of and responsibility for state spending in the legislature and the governor.

Even those persons or interests who seek the dedication of revenues for their own projects will admit that the earmarking of taxes or fees for other inter-

ests is a fiscal evil. But if allocation is permitted for one interest the denial of it to another is difficult, and the more special funds are set up the more difficult it becomes to deny other requests until the point is reached where neither the governor nor the legislature has any real control over the finances of the state. In one Rocky Mountain state the legislature is free to appropriate only 17 per cent of the tax collections; the rest are dedicated. In Alaska at present, 27 per cent of territorial funds are earmarked, primarily for school construction and roads.

6 Proceedings of the Alaska Constitutional Convention (PACC) Appendix V at 111 (Dec. 16, 1955).

Without earmarked funds, the constitutional framers believed that the legislature would be required to decide funding priorities annually on the merits of the various proposals presented. Delegate Barrie White, the spokesman for the committee which drafted section 7, stated in the convention debates:

[t]he Committee feels that if you accept the principle of not earmarking, it puts everyone in the same position and that the legislature will then be in the position being able to decide each case on its merits. If you go the other route and allow for earmarking or start drawing up all the exceptions that everybody would want to have drawn up, you are then back to the situation that most states now find themselves in, where an ever-increasing percentage of their revenues are earmarked for special purposes and an ever-decreasing amount is available to the general fund.

4 PACC 2364 (Jan. 17, 1956). Delegate White was then engaged in a colloquy about the appropriation of funds collected through licenses to agencies which had collected them:

Delegate Gray: "It doesn't earmark it but the talking point that these organi-

19. Alaska Const. art. IX, § 7.

20. 646 P.2d 203 (Alaska 1982).

21. *Id.* at 209 (internal footnote omitted).

22. 836 P.2d 936 (Alaska 1992).

zations have for the use of this money that is rightfully theirs, why, they haven't been precluded, they just have to sell their viewpoint to the legislature and if they need the money, why they probably could get it if they could talk them into it."

Delegate White: "They have to sell their viewpoint along with everybody else."

*Id.* at 2367.[23]

With this background in mind, we consider first whether proceeds from land sales and leases are revenues to which the dedicated funds clause applies, and second whether the University is exempt from the clause.

## 1. Proceeds from land are within the definition of "proceeds of any state tax or licence" for purposes of the dedicated funds clause.

SEACC argues that revenue derived from land is encompassed by article IX, section 7's reference to "proceeds of any state tax or licence." SEACC relies on our opinion in *State v. Alex,* quoting our statement that those who wrote the provision "intended it to prohibit not only the dedication of taxes, but also such revenue as the proceeds from the sale of state lands." [24] The University disagrees with that reading of the clause, arguing that revenue from land is not, according to the dictionary definitions of "tax" or "license," within its scope.

We reaffirm the reasoning and language of *Alex.* In *Alex,* we struck down a statute authorizing aquaculture associations to collect assessments from commercial salmon fishermen because it violated the dedicated funds clause.[25] Our opinion considered the meaning of the word "tax" and concluded that "the sense in which 'tax' is used in article IX, section 7 of the constitution must be determined from its context, both in the text and according to the discussion at the constitutional convention which adopted the wording." [26] We then turned to constitutional history, noting that the studies on which Constitutional Convention delegates relied encouraged adopting a prohibition on earmarking because the dedication of funds "curtailed the exercise of budgetary controls and simply amounted to an abdication of legislative responsibility." [27] We also remarked that the commission's studies "used the terms revenues, funds, and taxes interchangeably" in discussing this issue.[28] We interpreted an amendment to the proposed provision that inserted "proceeds of any state tax or licence" in the place of "all revenues" as an effort to "allow for the setting up of certain special funds, such as sinking funds for the repayment of bonds," rather than "to exempt some sources of revenue from the prohibition." [29] Thus, we held "that since the constitution prohibits the dedication of any source of revenue," the assessments in question could not be earmarked.[30]

We see no reason to hold differently now. In addition to the history described in *Alex,*

23. *Id.* at 938–39.

24. *Alex,* 646 P.2d at 210 (citing 3 Proceedings of the Alaska Constitutional Convention (PACC) 2317–19).

25. *Id.* at 204–05.

26. *Id.* at 208.

27. *Id.* at 209 (citing 3 Alaska Statehood Commission, Constitutional Studies pt. IX, at 29–30 (1955)).

28. *Id.* (citing 3 Alaska Statehood Commission, Constitutional Studies pt. IX, at 27–30 (1955)).

29. *Id.* at 210. We referred to a "well-researched" attorney general opinion from 1975, which "carefully and minutely detail[ed] the de-

bate of the constitutional convention on the point" and concluded that the clause applied to "any source of public revenue: tax, license, rental, sale, bonus-royalty, [or] royalty...." *Id.* at 210 (citing 1975 Formal Op. Att'y Gen. 9, 24 (May 2, 1975)). That opinion quoted a document on which the convention delegates had relied, noting that the amendment removing the words "all revenues" avoided having to make explicit necessary exceptions to the clause for "certain moneys, e.g., pension contributions, proceeds from bond issues, sinking fund receipts, revolving fund receipts, contributions from local government units for state-local cooperative programs, and tax receipts which the state might collect on behalf of local government units." 1975 Formal Op. Att'y Gen. 9, 6–7 (May 2, 1975) (quoting Mem. from Pub. Admin. Serv., Jan. 4, 1956).

30. *Alex,* 646 P.2d at 210.

the amendment to article IX, section 7 creating an exception for the Permanent Fund [31] indicates that the prohibition is meant to apply broadly. If only revenue collected as taxes or license fees were included, there would have been no need to expressly exempt "all mineral lease rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments and bonuses received by the State" [32] to ensure that placing those revenues in the Permanent Fund did not violate the constitution. [33]

The State argues that the grant of land and proceeds from it does not violate the dedicated funds clause because the grant of land and proceeds is not a dedication of revenue but rather an asset conveyance. The State asks us not to rely on *State v. Alex* but to rule that this case should follow what it contends is the reasoning of *Myers v. Alaska Housing Finance Corp.* [34] In *Myers*, we upheld the state's sale of future proceeds from settlements with tobacco companies against a challenge under the dedicated funds clause. [35] The State argues that the situation here—conveying real property and dedicating the proceeds the property will generate—is an analogous situation and thus does not violate the constitution. [36]

We disagree. In *Myers*, we explicitly accepted *Alex's* reasoning in determining that revenue from the settlement of a lawsuit was within the scope of the dedicated funds clause. [37] The legislature had authorized the sale of the right to future proceeds from the settlement for a lump-sum amount based on the present value of the future proceeds. [38] The legislature appropriated the lump sum in a single year for various purposes. [39] No dedicated fund was created nor were revenues placed in a pre-existing dedicated fund. Accordingly, we concluded that "[b]ecause the legislature sold the tobacco settlement and then appropriated the resulting income, it did not directly violate the anti-dedication clause." [40] Nonetheless, we were concerned that the transaction might be contrary to the spirit of the clause; ultimately, however, we found no constitutional violation. [41]

Thus *Myers* neither holds nor suggests that revenue from state property can be placed in a dedicated fund. Likewise, it does not imply that there is an exception to the dedicated funds clause applicable to revenue from state property. Instead, *Myers* suggests that the reach of the dedicated funds clause might be extended to statutes that, while not directly violating the clause by dedicating revenues, in some other way undercut the policies underlying the clause.

### 2. The University is not exempt from article IX, section 7.

■ The State would prefer that we affirm the superior court's holding on the alternative ground that the University's special status means that revenues generated by its

---

**31.** Article IX, section 7 includes three exceptions: (1) "as provided in section 15 of this article," (2) "when required by the federal government for state participation in federal programs," and (3) "any dedication for special purposes existing upon the date of ratification of this section by the people of Alaska." Article IX, section 15 creates the Permanent Fund. The other exceptions are not applicable to this case.

**32.** ALASKA CONST. art. IX, § 15.

**33.** *Id.* art IX, § 7.

**34.** 68 P.3d 386 (Alaska 2003).

**35.** *Id.* at 391–93.

**36.** The University makes a similar argument, contending that *Myers* creates an implied exception to the dedicated funds clause that encompasses the conveyance here.

**37.** *Myers*, 68 P.3d at 390–91.

**38.** *Id.* at 388.

**39.** *Id.* at 387–88.

**40.** *Id.* at 394.

**41.** *Id.* We stated:

Although selling the tobacco settlement revenue stream is an indirect method of producing an effect very similar to the prohibited dedication of those future revenues, the anti-dedication clause clashes with the legislature's appropriation power. We conclude that the sale of the tobacco settlement is constitutional because the legislative appropriation power includes the power to sell state assets, lawsuit settlements are not traditional sources of public revenue, and the legislature has the responsibility to manage the state's risk.

*Id.*

lands may be dedicated. The State and University argue, in effect, that article VII, section 2 of the Alaska Constitution creates an implied exception to the dedicated funds clause by authorizing the University to hold title to real property. Because, the appellees reason, University lands are not state lands, University land revenues are not state revenues, and therefore University land revenues can be dedicated. In addition to drawing this conclusion from the constitutional text, the appellees emphasize that the University's lands are distinct from state lands under certain statutes, such as the Alaska Land Act[42] and laws regarding public domain land.[43]

SEACC believes interpreting article VII, section 2 to permit ownership but deny control of proceeds harmonizes that provision with the dedicated funds clause without improperly reading an exception into the dedicated funds clause. Further, SEACC argues that the University is an instrumentality of the state for relevant purposes[44] and points out that the legislature controls the University's funding. Therefore, SEACC concludes, University revenues are subject to article IX, section 7.

Our case law establishes that University lands are state lands. Article VII, section 2 establishes the University, declares it a "body corporate," provides that the University "shall have title to all real and personal property now or hereafter set aside for or conveyed to it," and states that "[i]ts property shall be administered and disposed of according to law."[45] We considered the meaning of article VII, section 2 in *State v. University of Alaska*.[46] There, we held that the state could take land that Congress had granted to the University to be held in trust for it under the federal 1929 act, but that the state had to compensate the University with monetary damages or equivalently valuable land.[47] Our opinion emphasized article VII, section 2's command that "property shall be administered and disposed of according to law,"[48] and noted that " 'according to law' refer[s] to the legislature's power to make laws."[49] Thus, even when the University has title to land, "only the legislature can make laws effecting the disposal of land, not the Board of Regents."[50] We further observed that "[t]he natural resources article of the Alaska Constitution grants extensive powers to the legislature to control lands," which makes "clear that [the University lands received under the 1929 act] 'belong' to the state."[51] The conclusion we reached in *State v. University of Alaska*, that University land is state land, applies even more readily to the present case because the University land involved here is not shielded by a federal trust obligation. Statutory language treating University lands differently from other state land does not overcome this constitutionally based conclusion.

42. *See* AS 38.05.965.

43. *See* AS 14.40.291(a).

44. SEACC provides several examples of other purposes for which we have found that the University is part of the state, citing *University of Alaska v. National Aircraft Leasing, Ltd.*, 536 P.2d 121, 123–25, 127–28 (Alaska 1975) (holding that the University is protected by sovereign immunity and can be sued under statutes subjecting the state to suit); *University of Alaska v. Geistauts*, 666 P.2d 424, 427–28, 427 n. 3 (Alaska 1983) (holding that meetings of a university committee are subject to the Public Meetings Act); *Carter v. Alaska Public Employees Ass'n*, 663 P.2d 916, 920–21 (Alaska 1983) (holding that the University must comply with the requirements of the public records statute), and *Ellingstad v. State, Department of Natural Resources*, 979 P.2d 1000, 1007 (Alaska 1999) (holding that the University's treatment as a state entity under state law makes

transfer of contractual rights to it distinct from transfer to a private entity).

45. ALASKA CONST. art. VII, § 2.

46. 624 P.2d 807, 814 (Alaska 1981).

47. *Id.* at 815–16.

48. *Id.* at 814 (quoting ALASKA CONST. art. VII, § 2).

49. *Id.* at 815 n. 10.

50. *Id.* at 815.

51. *Id.* The court was referring to and quoting article VIII, section 2 of the constitution, which states: "The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people." *See id.*

Because University land is state land, revenue from University land is state revenue for purposes of the dedicated funds clause.[52] This conclusion receives additional support from two historical sources. Governor William Egan, who had served as President of the Constitutional Convention, vetoed a 1959 bill that would have given one million acres of land to the University.[53] He wrote:

> I am vetoing [the bill], a bill intended to reserve lands for the support of the University of Alaska, because I believe it wrong in principle, inconsistent with constitutional concepts and not in the public interest. In so saying, I may add that I would act similarly on any bill which sought, as this does, to make special disposition of the proceeds of public lands in aid of one public function to the exclusion of others.
>
> . . . .
>
> To return now, by the enactment of [this bill], to a proposal whereby lands are given piecemeal earmarking for various state functions would be a distinct step backward.
>
> If we are to return to the "internal improvement" concept of earmarking state lands, can we in good conscience limit the practice to the University? ... Certainly, this bill invites similar treatment for other state responsibilities. By this bill the door would be opened to an unplanned disposition, or dissipation, of the resource without regard to relative need and without regard

to the clear constitutional and congressional intent.[54]

Five years later, Senator Bob Bartlett, who had been Alaska's delegate to Congress during Alaska's statehood campaign, wrote to Governor Egan, explaining that the policies that underlie the dedicated funds clause impelled him to prevent the federal government from granting to the new state land that was already reserved for certain purposes:

> [A]t many times during the consideration of the statehood bill, efforts were made to set aside this amount of land or that amount of land for the common schools and for other educational uses. I always resisted these and, as it turned out, successfully. My conviction was—and is— that notwithstanding the possible need for such reservations in the early statehood bills, the reasons for such have long since evaporated. . . . [I]f dedication is made for one institution or one purpose, what argument could be made against expanding? None, of course.[55]

## B. The Land Grant Provisions of the Act Are Not Severable from the Dedication of Proceeds Provisions, but the Research Forest Provisions Are Severable.

■ The act does not contain a severability clause, but AS 01.10.030 inserts one into every statute passed by the legislature.[56] We have stated that this general severability provision creates only "a weak presumption in favor of severability."[57] In *Lynden*

---

**52.** *Cf. State v. Alex,* 646 P.2d 203, 210 (Alaska 1982). Our conclusion that revenues from University land are subject to the dedicated funds clause does not, of course, prohibit the dedication of revenues received from land grants under the 1929 act because such revenues are excepted from the prohibition by the second sentence of article IX, section 7. *See supra* note 30.

**53.** 1959 House Journal 1186, 1186–88; Terrence M. Cole, A Land Grant College Without the Land: A History of the University of Alaska's Federal Land Grant, A Report to the University of Alaska State-wide Office of Land Management 18–19 (1993).

**54.** 1959 House Journal 1186, 1186–87.

**55.** Letter from Bob Bartlett to William Egan (June 8, 1964), *in* Cole, *supra* note 53, at 17.

**56.** *See* AS 01.10.030 ("Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language: 'If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of this Act and the application to other persons or circumstances shall not be affected thereby.' ").

**57.** *Sonneman v. Hickel,* 836 P.2d 936, 941 (Alaska 1992) (citing *Lynden Transp., Inc. v. State,* 532 P.2d 700, 712 (Alaska 1975)). In *Lynden* we considered the significance of the legislature's including a specific severability clause within a statute as compared to its choosing not to include one. *See Lynden Transp.,* 532 P.2d at 711–12. We suggested that "the soundest interpretation ... is that, whereas a specific severability clause creates a slight presumption in favor of

*Transport, Inc. v. State,*[58] we described the two-part test for determining whether, after an unconstitutional portion of a statute has been severed, the remainder of the law can stand: the remainder may not stand alone "unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall." [59]

In arguing that the act should be entirely invalidated, excepting the research forest provision, SEACC focuses on the second part of the *Lynden Transport* test. It argues that the "central and critical intent behind the enactment of SB 7 and HB 130 was the creation of a permanent endowment trust fund for the University." Because this objective cannot be accomplished, SEACC argues that allowing the land grant provisions of the act to stand "would result in an entirely different statute than the legislature enacted." SEACC notes that under the sections that would remain if we permitted severance, the University would be the owner and manager of the granted lands but the proceeds from the sale or use of the land would not be placed in trust under AS 14.40.365(j) and AS 14.40.400(a)(2) and (c).[60] Instead, the proceeds would by default be deposited in the University receipts fund, which is a non-dedicated account subject to legislative appropriation.[61] Though the source of the funds might give the University a hope or expectation that the funds would be appropriated for the University, SEACC argues that this would be a mere "talking point," [62] and the legislature would be able to appropriate the funds for any agency and any purpose. SEACC also points out that the

entire proceeds from the sale or lease of the lands would be subject to appropriation each year. SEACC reasons that making all proceeds available to spend would conflict with the legislative intent that all net proceeds be capitalized and preserved in perpetuity in the ETF.

The State argues that the land grant provisions of the act are severable and could be given legal effect. The net proceeds from the land, the State argues, "would have to be accounted for with the other university receipts instead of with the endowment trust proceeds." The State contends that "the university still would benefit financially from having the 'talking point' of increased receipts when making its annual budget request." The State also argues that the University still would be required to use the land for development purposes and that use would contribute to Alaska's economy, "even if the land is not managed as part of the endowment trust." The State does not address SEACC's argument that the land, or the net proceeds derived from the land, would not be preserved in perpetuity.

The University's argument regarding severance is similar to that made by the State, but the University addresses SEACC's argument that net proceeds would be spent under the severed remainder rather than capitalized and preserved in the ETF. It contends that the legislature could still achieve its original purpose of preserving net proceeds by "simply appropriat[ing] some of the University receipts, equivalent to the amount of the annual proceeds from the HB 130 Lands, into the Endowment Trust Fund."

severability, a general clause creates an even weaker presumption," although "[f]or all practical purposes, the difference between the two is negligible." *Id.* at 712–13. More recently we have concluded that a built-in severability clause creates a "stronger" presumption of severability than the general savings clause of AS 01.10.030. *Alaskans for a Common Language, Inc. v. Kritz,* 170 P.3d 183, 213 n. 183 (Alaska 2007).

58. 532 P.2d 700 (Alaska 1975).

59. *Id.* at 713 (quoting *Dorchy v. Kansas,* 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed. 686 (1924)) (internal quotation marks omitted).

60. *See supra* note 1 (providing the text of these statutory provisions).

61. *See* AS 14.40.170(b)(4) (allowing the Board of Regents to receive university receipts and expend them subject to appropriation by the legislature); AS 14.40.491(4) (including "receipts from sales and rentals of university property" within the definition of university receipts).

62. This refers to the "talking point" colloquy between delegates Gray and White during the Constitutional Convention. *See supra* page 14.

■ The central question before us, then, is the one posed by the second prong of the *Lynden Transport* test: whether the legislature would have passed the act without requiring that net proceeds derived from the lands be placed and held in the ETF.[63] In other words, we consider whether the legislature would have granted the 250,000 acres of land to the University had it not believed it was able to dedicate the net proceeds from the land to the ETF.

One way to determine legislative intent is to decide whether the valid provisions would still further the main purpose of the act.[64] If the purpose is stated broadly as simply to improve the University's financial status, it would be possible to conclude that allowing the land grant provisions of the act to stand would serve this purpose. Under the severed provisions, net proceeds from the sale or use of the lands would be deposited in a non-dedicated fund, from which the legislature could make appropriations to any agency. But given that the source of the proceeds would be University lands, the University would have a "talking point," that is, a possible advantage over other agencies, when seeking the funds from the legislature.

But the main legislative purpose underlying the act cannot accurately be described as to provide a "talking point"—or indeed even to provide more funding—to the University. Instead, the act's main purpose is to enhance the University's permanent endowment so that the enhanced endowment will provide ongoing additional income to the University. The difference between granting land to provide additional funding and granting land to enhance an endowment to provide additional funding is not merely semantic. The difference is between providing support both from capital and income on the one hand, and on the other, preserving capital and providing support only from income.

The act's findings and purpose section indicates that the legislature believed that the University, as a land grant college, was underfunded in terms of its original land grant from Congress.[65] The land grant made under the act was designed to remedy this deficit. As with respect to the lands granted by Congress, all net proceeds derived from the sale or use of the land granted by the act were required to be placed in the ETF.[66] Only net earnings of the ETF could be spent.[67] In this way, the legislature sought to contribute to a "financially secure state university system," as a "cornerstone to the long-term development of a stable population and to a healthy, diverse economy in the state."[68]

The legislative findings show that the main purpose of the act was to make a land grant that would operate in a manner similar to the way that the University's federal land grant has operated since before statehood: the University is partially supported by net earnings from the ETF, which in turn is funded by net proceeds from revenues derived from the sale or use of land grant lands.[69] Under

**63.** See *Lynden Transp.*, 532 P.2d at 713 ("The crucial question, then, is what was the legislative intent.").

**64.** See *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 633 (Alaska 1999) (upholding severance and noting that invalidating the unconstitutional sections did not undermine "the structure of the Act as a whole"); *Sonneman v. Hickel*, 836 P.2d 936, 941 (Alaska 1992) (upholding severance and noting that after deletion "the remainder of the act still has the same meaning that it had with that subsection included"); *see also Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) ("The more relevant inquiry ... is whether the statute will function in a *manner* consistent with the intent of Congress.").

**65.** In particular, see findings 3 and 6, S.B. 7 § 1, *supra* note 1.

**66.** AS 14.40.400(a)(1) & (2).

**67.** AS 14.40.400(c) & (f)(2).

**68.** See finding 7, S.B. 7 § 1, *supra* note 1.

**69.** See Act of Jan. 21, 1929, ch. 92, 45 Stat. 1091, 1092 (1929) ("[A] fund shall be established in the Territorial treasury to carry out the purposes of this Act, and whenever any money shall be in any manner derived from any of the land granted same shall be deposited in the Territorial treasury in the fund. The Territorial treasurer shall keep all such money invested in safe interest-bearing securities.... The income from said fund may and shall be used exclusively for the purposes of such Agricultural College and School of Mines."); AS 14.40.400(c) ("The total return from the fund shall be used exclusively for the University of Alaska, as the successor under AS

the act as passed, the University would continue to receive only net earnings from the ETF. Proceeds from the sale or use of the granted land would be capitalized and placed in the ETF. The capital would not be spent. This long-term goal is reiterated in statements by S.B. 7's primary sponsor in committee meetings and floor debates.[70]

The land grant provisions of the act, if allowed to stand alone, would not enhance the University's endowment. With only the land grant provisions, the legislature would appropriate on an annual basis the net proceeds gained from the sale or use of the land. The appropriation could be directed in whole or in part to the University or any agency. The appropriated proceeds would be available for immediate use. They would not be capitalized and preserved. If the University were to sell the land, which would be likely given the legislature's goal of encouraging development, the land could be substantially disposed of within a few decades. Because the net proceeds from the land would be spent rather than saved, the benefits from the land grant, far from lasting in perpetuity, could be dissipated in a relatively short period of time.

As noted, though the State does not address the impermanency of the grant that would result if severance were permitted, the University does. It argues that a permanent benefit from the lands could be achieved if the legislature were to appropriate an amount equivalent to the annual net proceeds from the granted lands and place the amount in the ETF. We think this argument fails for two reasons.

First, there is a substantial question as to whether appropriating unrestricted funds into the ETF would in itself violate the dedicated funds clause. While the dedicated funds clause is not, of course, violated merely by the fact of an appropriation for a specific purpose, it would be of concern that the income generated by the appropriation would be dedicated. We think that there is sufficient doubt as to the constitutionality of an appropriation made for the purpose of generating dedicated income that the University's suggestion that this might be done cannot justify severance.[71]

---

14.40.030 of the Agricultural College and School of Mines.").

**70.** *See, e.g., Meeting of the House Finance Committee,* 21st Leg., 2d Sess. (Mar. 21, 2000) (statement of sponsor Sen. Robin Taylor, S. Finance Comm.) ("[U]nder the legislation the university would receive an endowment ... which would provide an economic base and greater autonomy and reduce the state's general fund support."); *Meeting of the House Resources Committee,* 21st Leg., 2d Sess. (Feb. 7, 2000) (statement of Jim Pound, legislative aide to Sen. Robin Taylor, on behalf of Sen. Taylor) ("[T]he purpose of the bill is to give the University of Alaska the land grants that it was promised by the federal government prior to statehood.... [T]he money will go into a trust account that will be drawn on primarily as an 'interest situation,' similar to the permanent fund, but it will be specifically designed for the University of Alaska."); *Floor Debate on Senate Bill 7,* 21st Leg., 2d Sess. (Mar. 30, 2000) (statement of Sen. Robin Taylor, S. Finance Comm.) ("I sincerely appreciate all the work that has been put in ... to pass a bill on to the governor that will provide for an endowment for our university.... What a wonderful position this legislature might find itself within in the next 10, 15 years if the university no longer has to be funded out of general funds."); *Floor Debate on Senate Bill 7,* 21st Leg., 2d Sess. (May 3, 1999) (statement of Sen. Robin Taylor, S. Finance Comm.) ("I can't think of a greater gift for this legislature to give future generations of Alaskan students than to provide their university with a solid, stable, autonomous land base upon which they may develop and encourage and strengthen our university.").

**71.** Our cases have not specifically addressed whether income earned by an agency from appropriated funds is covered by the dedicated funds clause. A 1982 attorney general opinion considered this question and concluded that such income likely would be covered. The opinion discusses policy reasons that would also apply to appropriating money to dedicated funds:

A difficulty that arises from the view that the dedicated funds prohibition is not applicable to interest or investment income on separate funds is that it permits steadily increasing amounts of money to be received and used by state departments and agencies without legislative control through the annual budget process. This is precisely the problem posed by the dedication of revenue sources which the drafters sought to avoid. For this reason, while we are not certain about the likely outcome, we doubt that a blanket exception for derivative income would be approved by the courts.
.... Although not expressly addressed by them, the framers were very much aware of the boom-bust cycle of Alaska's economy. In fact, a driving force behind statehood was the

Second, under the University's proposed solution, the legislature would have to decide each year whether to appropriate net proceeds into the ETF. This decision would be made in competition with the demands of other agencies for funding. Whether in fact the legislature would appropriate the net proceeds into the ETF in any given year could not be predicted. Depending on annual discretionary appropriation decisions would be a poor substitute for the capital preservation system mandated by the act. Unlike the severable provisions in *Sonneman*, the trust provisions in this case are not a "minor part" of the overall act.[72]

In summary, we conclude that the land grant provisions, if severed from the provisions requiring proceeds to be placed and held in the ETF, would not serve the act's main purpose and would operate strikingly differently from the original act. In *Alaskans for a Common Language, Inc. v. Kritz*[73] we observed that "the risk involved in severing a statute is that an erroneous judicial reading of the intent of those who enacted the statute will result in a statute that no one wanted." [74] In light of the considerations we have discussed above, we believe that there is a distinct risk that allowing the land grant provisions to stand without the strict protections the legislature imposed to ensure that the grant would last in perpetuity would result in a law that the legislature would not have wanted.

■ But the provisions of the act creating a research forest stand on a different footing. They are directly related to the core education and research function of the University and not to the objective of enhancing the University's endowment. The section of the act establishing the research forest, AS 14.40.461(a), starts with its own statement of purpose: "For the purpose of advancing research into forest practices, ecology, wildlife management, and recreation, a university research forest is established." [75] Although if the research forest provisions stand, they will not advance the main purpose of the act—enhancing the University's endowment—that would be the case even if the whole act were upheld as constitutional. None of the parties argues that the research forest provisions should be stricken. We agree because the research forest provisions are so separate in purpose from the rest of the act as to be sui generis.[76] And since the main purpose of the research forest is not the generation of proceeds for the University endowment, the provisions creating it will function when severed primarily as they would have functioned if the rest of the act were held constitutional and allowed to stand. For these reasons we conclude that the research forest provisions are severable.

## V. CONCLUSION

As this case illustrates, dedicating funds for a deserving purpose or a worthy institution is an attractive idea. Our constitutional founders were aware of the power of the dedication impulse. They decided that the good that might come from the dedication of funds for a particular purpose was outweighed by the long-term harm to state fi-

---

desire of Alaskans themselves to be able to manage the income derived from those brief periods ... when the state may receive enormous sums of money which are then immediately available for expenditure or placement, by appropriation, into a variety of funds and accounts for various permissible purposes. Depending on the number and size of those funds and accounts, the interest earned on the money placed in them could itself be substantial.... [T]he significance of that interest income in properly managing the state's budget leads us to the conclusion that our framers would have considered it to be within the dedicated fund prohibition.
1982 Formal Op. Att'y Gen. 13 at 16–17.

**72.** *See Sonneman v. Hickel,* 836 P.2d 936, 941 (Alaska 1992).

**73.** 170 P.3d 183 (Alaska 2007).

**74.** *Id.* at 210.

**75.** H.B. 130 § 6 (codified as AS 14.40.461(a)).

**76.** The time of conveyance and interim management of the research forest lands is also distinct. The rest of the land under the act was to be conveyed by July 1, 2008, but the research forest is not to be conveyed until 2055. AS 14.40.365(b). Before conveyance to the University, the Department of Natural Resources will manage the property and may sell timber rights. AS 14.40.461(c) & (d).

nances that would result from a broad application of the practice. In accordance with this belief, they promulgated article IX, section 7 of the Alaska Constitution, barring the dedication of state funds. We enforce the considered judgment of the founders in this case. We do so with full awareness that the University is an important state institution and that it would benefit from the enhanced endowment that the legislature intended to bestow.

We conclude that University lands are state lands, that proceeds from University lands are state funds that are subject to the dedicated funds clause, and therefore that the act violates the dedicated funds clause. With the exception of the land for the research forest, the land grant provisions of the act are not severable from the dedication of proceeds provisions because without the dedication provisions the proceeds from the granted lands would not be capitalized and preserved in perpetuity as a source of income for the University. Instead, a grant that was intended to last forever could be dissipated over time by the consumption of both capital and income. We decline to order severance because this result differs greatly from the act's intended operation.

 For these reasons the judgment of the superior court is REVERSED. This case is REMANDED to the superior court with instructions (1) to order reconveyance to the State of the land transferred under the act, (2) to order the return of any net proceeds received from the land, and (3) to enter judgment in favor of the appellants in accordance with the views expressed in this opinion.[77]

WINFREE, Justice, not participating.

---

[77]. The State argues that the doctrine of laches bars the appellants from requesting that any land already transferred pursuant to the act be returned to it. We disagree. The appellants' decision to file suit only after H.B. 130 revised S.B. 7 was reasonable, and the State and University have been aware of the possibility that the bills would be struck down since this case was filed. Furthermore, the public interest in compliance with the constitution is paramount here. We have previously held that public interest is a factor in considering a laches claim, *see Jackson v. Kenai Peninsula Borough for Use & Benefit of Kenai,* 733 P.2d 1038, 1043–44 (Alaska 1987); *Moore v. State,* 553 P.2d 8, 19–20 (Alaska 1976), and thus constitutional values put significant weight on the side of rejecting the defense, *cf. Gwich'in Steering Comm. v. State, Office of the Governor,* 10 P.3d 572, 585 (Alaska 2000) ("[A] suit brought to ensure compliance with statutory and constitutional policies that concern the public as a whole effectuates strong public policies.").